2022 IL App (1st) 210402

SIXTH DIVISION
September 9, 2022

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

Nos. 1-21-0402 & 1-21-0584

| | | |
|---|---|---|
| *In re* COMMITMENT OF DANIEL HOLT | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 16 CR 80004 |
| v. | ) | |
| | ) | |
| Daniel Holt, | ) | Honorable |
| | ) | Michael Clancy, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Mitchell concurred in the judgment and opinion.
Justice Oden Johnson concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 Following a bench trial and a commitment hearing held pursuant to the Sexually Violent

Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2018)), the trial court adjudicated

the respondent, Daniel Holt, a sexually violent person and committed him to the care, custody, and

control of the Department of Human Services (DHS) for enrollment in a conditional release

program. The court subsequently approved DHS's detailed plan for Mr. Holt's conditional release.

¶ 2 On appeal, Mr. Holt argues that (1) the trial court should have granted his motion to strike

certain portions of the State's expert testimony, both because it was not based on specialized

knowledge and because it impermissibly relied on the experts' own interpretation of the statutory

language; (2) the evidence was insufficient to prove beyond a reasonable doubt that he was a sexually violent person; and (3) several of the conditions imposed by the court on his release violate his constitutional rights. For the reasons that follow, we affirm the trial court's orders denying the motion to strike and finding that Mr. Holt is a sexually dangerous person. We reverse, however, the court's order approving DHS's plan for Mr. Holt's conditional release and remand for that plan to be revised in accordance with this opinion.

¶ 3                                     I. BACKGROUND

¶ 4     In 1999, Mr. Holt pleaded guilty to the predatory criminal sexual assault of a child and was sentenced to 20 years in prison. Mr. Holt had pleaded guilty before to multiple counts of aggravated criminal sexual abuse in 1990 and one count of criminal sexual assault in 1991. As the date of Mr. Holt's release approached, the State petitioned the court for his involuntary commitment pursuant to section 40 of the Act (725 ILCS 207/40 (West 2014)). To supply context for our summary of the State's allegations and the evidence presented for and against its petition, we provide the following brief overview of commitment proceedings under the Act.

¶ 5                        A. Commitment Proceedings Under the Act

¶ 6     The Act authorizes the involuntary civil commitment of anyone found by a court or jury to be a "sexually violent person" to DHS for "control, care and treatment." 725 ILCS 207/40(a) (West 2018). The Act defines a sexually violent person as an individual who has "been convicted of a sexually violent offense" and who "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *Id.* § 5(f). A "mental disorder" is further defined as any "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b). If, following a hearing, the court determines that probable cause exists to believe a

respondent is eligible for commitment, it will order him or her be detained pending trial of that issue. *Id.* § 30. Both the State and the respondent have the right to retain an expert, and a court-appointed expert will be provided for indigent individuals. *Id.* § 25(e). If the State proves beyond a reasonable doubt that an individual is a sexually violent person, that individual may be committed indefinitely—"until such time as the person is no longer a sexually violent person." *Id.* §§ 35(f), 40(a). If the State does not meet this burden, its petition must be dismissed. *Id.* § 35(f).

¶ 7                                B. The State's Petition

¶ 8     The State asserted in its April 14, 2016, petition in this case that Mr. Holt suffered from several mental disorders, "as defined by the Act and as set forth in the Diagnostic and Statistical Manual for Mental Disorders," including "Pedophilic Disorder, Sexually Attracted to Females, Non-Exclusive Type, Alcohol Use Disorder, and Antisocial Personality Disorder." The State maintained that these mental disorders constituted a "congenital or acquired condition affecting [Mr. Holt's] emotional or volitional capacity that predispose[d] [him] to commit acts of sexual violence" and asserted that he was "dangerous because his mental disorders [made] it substantially probable that he [would] engage in acts of sexual violence."

¶ 9     In support of its petition, the State attached the March 22, 2016, report of Dr. Mark Kuzia, a licensed clinical psychologist and sex offender evaluator. Dr. Kuzia interviewed Mr. Holt over the course of approximately three hours on March 9, 2016, and reviewed police and Illinois Department of Corrections (IDOC) records documenting Mr. Holt's history of sexual offenses, sex offender treatment, substance abuse, and medical and mental health issues.

¶ 10    Dr. Kuzia noted that Mr. Holt had several convictions for sexual offenses. In 1989 he was charged with rubbing the breasts and vagina of a 12-year-old victim (Case No. 89 CR 13518), rubbing the breasts of an 11-year-old victim (Case No. 89 CR 13519), and rubbing the breasts and

vagina of a 13-year-old victim through her clothing (Case No. 89 CR 13520). Mr. Holt pleaded guilty to these charges and received three years of probation. During their interview, he explained to Dr. Kuzia that the three victims had been friends of his younger sister. He was "playing grab as*** with one of the girls, and she "went the next day and told the school counselor." When asked about the other two victims, Mr. Holt said that "[t]here was a household full of people there" and he was "just being arrogant," just "acting out" and "seeing what [he] could get away with." Mr. Holt said "I didn't think I was doing anything wrong. Clearly, I do now. *** I obviously had a feeling towards young girls."

¶ 11 While still on probation, Mr. Holt was arrested for criminal sexual assault. The victim stated that she met Mr. Holt at a bar and agreed to leave with him to get something to eat and that he took her upstairs to his apartment to get money. Once inside, according to the police report, Mr. Holt "forcefully had oral, rectal and vaginal sexual intercourse" with the victim "while threatening [her] with a knife." Mr. Holt then drove the victim back to the bar. When asked about the encounter, Mr. Holt told Dr. Kuzia: "I picked her up. We were making out. She said stop I have a boyfriend. Did I stop immediately. No. I didn't know, I was confused. We were both hammered. We were having sex. Should I have stopped sooner? Yeah, I guess in hindsight." Mr. Holt insisted that "[t]here was no violence." He pleaded guilty and was sentenced to six years in prison, to be served concurrently with sentences he received for violating probation in each of his other cases.

¶ 12 Most recently, Mr. Holt was arrested in 1999 for the predatory criminal sexual assault of a child. He again pleaded guilty and was sentenced to 20 years in prison. Dr. Kuzia noted that, according to the facts stipulated to as part of the plea:

> "The defendant, Daniel Holt, was a neighbor of the five-year-old victim in the same apartment complex. On July 12, 1998, at about 10:30 P.M. the defendant was seen with the

victim on the grounds and then the victim went into his apartment with him. Less than ten minutes later when the victim's mother was looking for her, a witness pointed out the defendant's apartment and then the victim came outside crying. *** the victim said nothing happened to her and that they kept their clothes on. However, examination at the hospital showed a slight vaginal irritation and vaginal and rectal swabs were positive for semen. DNA analysis showed that it was the defendant's semen on the swabs."

¶ 13    Regarding this offense, Mr. Holt told Dr. Kuzia: "I didn't know these people. I was on a three-day coke binge and it was random." He explained that the girl was playing outside his patio and he "just manipulated her into coming in." Mr. Holt insisted that he did not penetrate the victim or hurt her physically but "took her pants down and masturbated over her body." Mr. Holt stated "I had belief that if I didn't touch her I wouldn't hurt her. Obviously, I was very wrong."

¶ 14    It was Dr. Kuzia's clinical opinion, to a reasonable degree of psychological certainty, that Mr. Holt met the diagnostic criteria for "Pedophilic Disorder, Sexually Attracted to Females, Non-Exclusive Type"; "Alcohol Use Disorder"; and "Antisocial Personality Disorder." Mr. Holt met the criteria for pedophilic disorder because he had "evidenced a clear, well-established pattern of sexually motivated molestations of prepubescent children beginning when he was approximately 22-years-old" and that pattern had "lasted over a period of 5 years." Mr. Holt "admitted during an interview that he had an 'infatuation with children, with little girls,' that he would masturbate to 'little girls,' and [that] his high risk situations would be, 'A place where there is a bunch of children.' " This awareness of the problem, coupled with multiple sex offenses against children, suggested to Dr. Kuzia that Mr. Holt suffered from "an inability to control his sexual urges."

¶ 15    Dr. Kuzia believed that Mr. Holt also met the criteria for alcohol use disorder because his use of alcohol had "led to recurrent social or interpersonal problems," his efforts to cut down on

his drinking had been unsuccessful, and he had continued to use alcohol "despite knowledge of having a persistent or recurrent psychological problem likely to have been exacerbated by alcohol." Mr. Holt reported using alcohol prior to committing each of his previous sexual offenses. He had attended Alcoholics Anonymous and Narcotics Anonymous meetings throughout his incarceration and planned to continue attending them in the future.

¶ 16 Finally, Dr. Kuzia believed that Mr. Holt met the criteria for a diagnosis of antisocial personality disorder. He had "established a pervasive pattern of disregard for and violation of the rights of others, *** as indicated by repeatedly engaging in acts that [were] grounds for arrest, deceitfulness, lying, impulsivity or failure to plan ahead, irritability and aggression, as indicated by repeated assaults, reckless disregard for the safety of others, and consistent irresponsibility."

¶ 17 To assess Mr. Holt's risk of committing future acts of sexual violence, Dr. Kuzia applied the 10 fixed risk factors known as the Static-99R. Mr. Holt received a score of 6, putting him in the "High Risk" range. Alongside this score, Dr. Kuzia considered additional, dynamic risk factors. Mr. Holt had a "deviant sexual interest in prepubescent children," a "[r]esistance to rules and supervision," a "[l]ack of emotionally intimate relationships with adults," and "[l]ifestyle [i]mpulsivity," which Dr. Kuzia defined as "poor self-control, chronic instability to employment and housing, lack of meaningful daily activities, irresponsible decisions, and unrealistic long-term goals." Mr. Holt also had a history of sexually offending while using drugs or alcohol. Dr. Kuzia explained that these additional risk factors did not increase his overall risk level but were useful to understand his "specific areas of vulnerability."

¶ 18 Dr. Kuzia identified no protective factors to weigh against Mr. Holt's risk of reoffending. He believed Mr. Holt met the criteria for a sexually violent person under the Act and recommended him for civil commitment. He concluded both that Mr. Holt suffered from "congenital or acquired

conditions affecting his emotional and volitional capacity" and that he exhibited "a substantial and continuing risk for sexual offense recidivism."

¶ 19    Counsel was appointed to represent Mr. Holt and, following a hearing, the trial court found that there was probable cause to detain him pending a ruling on the State's petition.

¶ 20              C. The Evidence at Trial and the Court's Adjudicatory Finding

¶ 21    Mr. Holt waived his right to a jury, and a two-day bench trial was held in summer 2019.

¶ 22                            1. The State's Experts

¶ 23    The State presented the testimony of two experts: Dr. Kuzia and Dr. Richard Travis. The parties stipulated that both were experts in clinical psychology, with Dr. Kuzia also specializing in the risk assessment of sex offenders and Dr. Travis in the evaluation and treatment of sex offenders. The experts agreed, to a reasonable degree of psychological certainty, that Mr. Holt met the criteria for a sexually violent person under the Act. They both diagnosed him with pedophilic disorder, antisocial personality disorder, and alcohol use disorder. Dr. Travis also believed he suffered from cannabis and cocaine use disorders. Both experts opined that these conditions were congenital or acquired conditions that predisposed Mr. Holt to engage in acts of sexual violence.

¶ 24    The experts explained their evaluation processes and testified consistently with their written reports. Dr. Kuzia acknowledged that over three years had passed since he wrote his report but explained that he had reviewed Mr. Holt's most recent treatment records and believed Mr. Holt still met the diagnostic criteria for each of the mental disorders he had diagnosed him with in March 2016. Dr. Travis explained that he tried to meet with Mr. Holt in May 2016, when he prepared his own written report, but that Mr. Holt declined to speak with him at that time. He did not feel, however, that his inability to speak with Mr. Holt "hinder[ed] him in coming to an opinion that [he thought] was *** well-based on records."

¶ 25    Dr. Travis explained that the diagnostic criteria for pedophilic disorder were intense urges, fantasies, or behaviors felt by a person over the age of 16 that last for six months or more and involve sexual activity with prepubescent children who are at least five years younger than the individual. Mr. Holt met these criteria because of his past offenses, his own self-reported interests, and the results of multiple penile plethysmography (PPG) tests, which measure sexual arousal to various stimuli.

¶ 26    Dr. Kuzia reached the same conclusion. Mr. Holt's treatment records from 2017 indicated to him that Mr. Holt realized his condition was "not just experimental in nature" but was "a chronic condition" that he would have to "deal with the rest of his life." As part of his therapy, Mr. Holt had created a timeline and written about his past offenses, identifying 21 victims in total, including 13 under the age of 13 and 6 under the age of 8. He also admitted that at the time of his most recent offense he had been grooming several other child victims.

¶ 27    Dr. Travis defined antisocial personality disorder as "an enduring pattern of using other people, violating their boundaries, [and] taking what you want without consideration of other people." There are a number of criteria for this condition, including the violation of rules and laws, deceitfulness, reckless disregard for the safety of others, irritability and hostility, lack of remorse, and impulsivity. Dr. Travis believed Mr. Holt "met many of the criteria" and at times, "maybe all of them." Dr. Kuzia further explained that the disorder was "a lifelong condition" whose symptoms could abate over time. He agreed that Mr. Holt had not exhibited behaviors associated with the disorder recently because he was in a detention setting. According to Dr. Kuzia, "that [did not] necessarily mean that he [would not] engage in the future," only "that Mr. Holt recogniz[ed] that the behaviors [would] not serve a purpose while he [was] detained."

¶ 28    Regarding the substance abuse disorders, Dr. Travis noted that Mr. Holt "had a problematic

pattern of drinking alcohol, using marijuana, and using cocaine," that he "continue[d] to use it even in situations where he [knew] it cause[d] him problems," and that he had unsuccessfully tried to quit multiple times. In a controlled environment like prison or the DHS temporary detention facility, Mr. Holt did "pretty well" and had "done a lot of good work in that area from the homework that [Dr. Travis had] read and reviewed." Dr. Travis acknowledged on cross-examination that prison inmates and residents of temporary detention facilities sometimes have access to homemade alcohol, known as hooch, and that Mr. Holt had never been written up for its production or consumption.

¶ 29    Dr. Travis explained to the court how these mental disorders reinforced each other, stating: "His pedophilic disorder drives his behavior particularly against prepubescent children. He has a sexual interest, sexual arousal, that he is unable to manage adequately *** in the community.

He—this intense sexual interest, he engages in these behaviors even when they have resulted in convictions, even when he has access to adult females. ***

*** And he doesn't mind violating the boundaries. So antisocial personality disorder plays a real disinhibitive effect when it's combined with his pedophilic disorder, which is the sexual drive part of his—of his sexual problems.

And then the substance use disorders on top of that, mainly are disinhibitive also in that they also kind of grease the wheels toward him engaging in problematic sexual behavior and harmful sexual behavior. And then he has spoken about—especially with the cocaine—about how that actually fueled some of his sexual drive and his hypersexuality. And he talked about being addicted to sex and cocaine and how those were somewhat tied together for him."

¶ 30    Both of the State's experts used actuarial instruments to conclude that it was substantially probable that Mr. Holt would reoffend. Dr. Kuzia assigned him a score of six on the Static-99R risk-assessment instrument, noting that the average sex offender scores a two on that instrument. Mr. Holt was thus "3.77 times more likely to reoffend" than the average sex offender. Dr. Travis used both the Static-99R and another tool called the Static-2002R. He assigned Mr. Holt scores of seven and eight, respectively, using these predictive tools. Dr. Travis explained that for each test, Mr. Holt's score placed him in "level four B," the highest of five risk categories, which meant that he was "about five times more likely to sexually reoffend than a typical sex offender."

¶ 31    Both experts also noted the presence of dynamic risk factors that can change over time. Dr. Kuzia testified that the factors identified in his report—a deviant sexual interest, a history of sexually violent behavior, resistance to rules and supervision, lifestyle impulsivity, and a lack of emotionally intimate relationships with adults—were all still present. Dr. Travis testified that he looked at dynamic risk factors associated with a tool called the Stable-2007, as well as risk factors from two meta-analyses conducted in 1998 and 2004. He noted that his "way of doing this [had] evolved" as he had kept up with new advancements in the field. Dr. Travis acknowledged that the best way to assess dynamic risk factors is "to get the interview." When, as here, that is not possible, however, he "can do it based upon file material" but said "I try to be more conservative when I do it that way." He explained that, although a low score on the tool that considers the dynamic risk factors can reduce a person's overall risk, here, the presence of a number of those factors instead simply reenforced Mr. Holt's already high-risk static scores.

¶ 32    Both experts agreed that there were no protective factors likely to mitigate Mr. Holt's risk of reoffending. Mr. Holt's age only offset his static score by one point—an adjustment already built into the tool—and he had no debilitating medical conditions that would prevent him from

reoffending. Both doctors acknowledged that individuals who complete sex offender treatment are statistically less likely to reoffend, but both believed that Mr. Holt, though progressing through treatment, was not yet at that stage.

¶ 33    Both doctors agreed that, after they had completed their written reports but before they testified, they had reviewed additional prison records indicating that Mr. Holt had attended more treatment sessions than they initially believed. But neither doctor changed his opinions based on these new records. Dr. Travis explained that, although they demonstrated to him that Mr. Holt had made "considerable progress" with his treatment, he still believed Mr. Holt was a sexually dangerous person as defined by the Act.

¶ 34    Counsel for Mr. Holt moved to strike several portions of the State's expert testimony. Relevant to this appeal, counsel argued that (1) because neither Dr. Kuzia nor Dr. Travis could tell the court if Mr. Holt's pedophilic disorder was congenital rather than acquired, their opinion that it was one of the two was not based on specialized knowledge and (2) each doctor impermissibly relied on his own interpretation of the Act when asked to opine on whether Mr. Holt was substantially likely to reoffend. The trial court rejected both arguments.

¶ 35    The State rested, and Mr. Holt's counsel unsuccessfully moved for a directed finding.

¶ 36                                  2. Mr. Holt's Testimony

¶ 37    Mr. Holt then took the stand. He testified that he was born in 1966 and grew up in Illinois and that he moved around a lot as a child because his father was an alcoholic and sometimes underwent long-term treatment out-of-state. Mr. Holt described his childhood as dysfunctional. His father was rarely home, and his mother suffered from depression and was verbally and physically abusive. Mr. Holt testified that he was sexually abused, from the ages of 8 to 11, by the teenage son of his mother's best friend. He tried to run away from home. When he told his mother

about the abuse, she "whooped [him]," telling him "never to speak of such a thing again."

¶ 38     Mr. Holt quit school in the eleventh grade. Although he was illiterate, he understood that his grades would "get fixed" because of his performance on the school's football team. His coach, however, was "arrested for that type of behavior," and Mr. Holt was left with no way to graduate. He ran away from home again as a teenager. Mr. Holt said he joined a local gang at the age of 11 and began drinking and using drugs regularly. He underwent treatment several times and experienced some periods of sobriety but always relapsed. He worked at a variety of jobs over the years in construction and sales. Mr. Holt described his relationships with women as "problematic."

¶ 39     In prison, Mr. Holt became involved in a 12-step substance abuse program, found a mentor, and remained involved in that program for the duration of his incarceration. He received his GED in 2009, an associate degree in liberal studies in 2011, and took a two-year course to be certified as an optician in 2014, enabling him to work cutting lenses down to fit into eyeglass frames.

¶ 40     Mr. Holt testified that he began sex offender treatment within the first two years of arriving at Dixon Correctional Center, where he was incarcerated from approximately 2008 to 2016. He worked with Dr. Weiner for 4 years and Dr. Bochenek for 2½ years. His group met twice a week and received assignments that they completed and presented to the group at each session. They did autobiographical and role-play work and worked on "preparing [their] cycle[s]," which Mr. Holt described as breaking down their behaviors to understand what their triggers and patterns were as sex offenders. It took Mr. Holt a year of work with Dr. Weiner to complete his cycle. He then began working on his "critical choice points," which he described as "interventions *** when [his] thinking got distorted."

¶ 41     Mr. Holt explained that sex offender treatment was optional, no one forced him to go, and he stayed even after Dr. Weiner, who had really helped him, left the program. He said "I was

comfortable there. I knew the guys there and it was my support system." Before the treatment he received in prison, Mr. Holt said he "never really looked at any problems that [he] had as something that [he] could deal with on [his] own." Because he drank, "it was easy for [him] to cop out and not be responsible for these situations." Mr. Holt stopped attending sex offender treatment a year to a year-and-a-half before his release because he felt that he "had gone as far as [he] could with that program." He did not believe he would reoffend if permitted conditional release because he had "been working the program for as long as [he had]."

¶ 42    Although Mr. Holt was appointed an expert by the court, he declined to call her to testify at trial.

¶ 43    Following a detailed summary of the expert testimony and other evidence that it had considered, the trial court found that the State had proven beyond a reasonable doubt that Mr. Holt was a sexually violent person, as defined by the Act. The case was continued so that Dr. Travis could interview Mr. Holt in advance of the dispositional hearing.

¶ 44    D. The Dispositional Hearing and Approval of DHS's Plan for Conditional Release

¶ 45    Dr. Travis ultimately concluded that conditional release was an appropriate disposition for Mr. Holt. This prompted the State to retain a third expert, Dr. Paul Heaton, to render a second opinion on that issue. Due to delays caused by the COVID-19 pandemic, however, by the time Dr. Heaton evaluated Mr. Holt on February 2, 2021, nearly two additional years had passed.

¶ 46    The dispositional hearing was finally held on March 4, 2021. The parties stipulated that, if called to testify, both Dr. Travis and Dr. Heaton, as experts in clinical psychology and in the evaluation, diagnosis, and assessment of risk of sex offenders, would testify that Mr. Holt had "reached phase four and *** completed his relapse prevention plan," that he had thus "made sufficient progress in treatment to the point where he [was] not substantially probable to engage in

acts of sexual violence if on conditional release," and that the "least restrictive, most therapeutic environment" for Mr. Holt was in "the Liberty Health Care Conditional Release Safety 1st Program." On the basis of this stipulation and the doctors' corresponding written reports, the trial court agreed with the parties that Mr. Holt was now eligible for conditional release and directed DHS to prepare a conditional release plan by May 3, 2021.

¶ 47 The written plan prepared by DHS called for Mr. Holt's conditional release to be managed by DHS and its contractor, Liberty Healthcare Corporation (LHC). The plan requires Mr. Holt to receive "a minimum of 1 hour of individual and 1.5 hours for group sex offender specific treatment" at LHC, complete sex offender registration within 72 hours of release, and to serve an initial period of home confinement for at least 30 days. An LHC conditional release agent is to convene weekly meetings with Mr. Holt's case management team, meet regularly with Mr. Holt to discuss his compliance with the conditions of his release and treatment programs, and meet with his sex offender therapist to discuss his compliance with treatment. The plan makes clear that "[p]eriodic to frequent covert and overt surveillance will be conducted on [Mr.] Holt as necessary to ensure compliance with [his] conditions of release," including "random home visits"; searches "of the premises, person and personal property"; polygraph and drug/alcohol testing; and "Global Positioning System tracking." If at any time the LHC conditional release agent believes that Mr. Holt has violated a condition of his release, that person is authorized by the Act to arrange for Mr. Holt to be taken into police custody pending a revocation hearing.

¶ 48 On May 3, 2021, when the plan was presented for court approval, Mr. Holt's counsel raised objections to a number of the conditions. Objections to the following conditions are relevant to this appeal:

"24. Not to publish any materials or print any advertisements without providing a

copy of the proposed publications to the LHC conditional release agent and obtaining permission prior to publication;

\* \* \*

28. Comply with all other special conditions that the LHC conditional release agent and DHS case management team may impose that restrict you from high-risk situations and limit your access to potential victims;

\* \* \*

33. Not possess any computer or tablet and shall not have any direct or indirect internet access through any TV, any type of phone, computer, watch, tablet, video gaming device or any electronic device capable of accessing the internet; you shall not use the internet at any residence or any other location including but not limited to places of employment, retail stores, grocery stores, restaurants, coffee shops, libraries, and schools; you shall not use any Wi-Fi connections or hotspots; if you are found in possession of a computer, tablet or other electronic device in your residence or elsewhere, you shall consent to a forensic evaluation of the computer, tablet or other device, and all peripheral components, hardware and software that may be installed on the computer, tablet, or other device; any type of phone including a smart phone found at your residence shall be confiscated and a forensic check may be made at the request of the LHC agent;

\* \* \*

41. Remain in your home on any official or unofficial day celebrated as Halloween or during any trick-or-treat gathering or function or any other holiday; refrain from any travel on designated holidays unless for verified employment or counseling and approved by LHC conditional release agent; refrain from answering the door for trick-or-treaters,

Christmas carolers, or children who are engaged in fundraising, collecting or canvassing door to door for any reason; refrain from passing out any toy, treat, item to trick-or-treaters or have any trick-or-treat items in your home; you or anyone residing at your residence are not allowed to have your porch light on during any of the official or unofficial trick-or-treat days and you are not allowed to display any Halloween decorations or decoration for any other holiday; refrain from dressing up in any type of costume at any time or for any holiday, custom or observance such as Halloween, Christmas, Easter or birthdays; you and anyone residing with you shall not have or participate in an Easter egg hunt or allow anyone to use your residence for this purpose; refrain from participating in these events at all times including when you are at your place of employment and at church;

\* \* \*

57. Not have contact of any type with an animal of any species and you are not allowed to visit, be near or around any zoo, petting zoo, circus or anywhere animals may be present and/or that attract children;

\* \* \*

66. Be responsible for compliance with each of the above conditions and will accordingly take an active role in ensuring that you comply with all conditions. If there are any questions as to whether an activity is permissible it is the Respondent's responsibility to inquire prior to engaging in said activity;"

¶ 49 In response to counsel's objections, the assistant attorney general representing the State pointed out that Mr. Holt had already signed and initialed a certification indicating that he had received a copy of DHS's plan, that he understood it, and that he agreed to comply with each of the conditions of his release. It was also more appropriate, she posited, for Mr. Holt to demonstrate

compliance with his initial period of home confinement and then raise issues individually with his treatment team before asking the court to get involved.

¶ 50    The court acknowledged that the plan was "burdensome," that the onus was on Mr. Holt to comply with each of the provisions, and that there were "a ton of conditions" and "quite a bit of supervision." But this was necessary, the court explained, both to facilitate Mr. Holt's continued progress and for the safety of the community. The court emphasized that the conditional release of a sexually dangerous person is a unique situation, stating "it's not like it's a regular probation or something like that." The court noted Mr. Holt's objections for the record but ordered the conditional release plan to take effect "as Mr. Holt ha[d] signed off and agreed."

¶ 51                                    II. JURISDICTION

¶ 52    On August 1, 2019, the trial court found Mr. Holt to be a sexually violent person pursuant to the Act. Following a dispositional hearing, on March 4, 2021, the court ordered that Mr. Holt's commitment should be to conditional release. On May 3, 2021, the court then approved DHS's plan for Mr. Holt's conditional release. Mr. Holt filed timely notices of appeal from those rulings on April 1, 2021, and May 10, 2021, respectively, and his appeals were consolidated in this court. We have jurisdiction over the consolidated appeals pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the trial court in civil cases.

¶ 53                                    III. ANALYSIS

¶ 54    On appeal, Mr. Holt argues that (1) the trial court should have granted his motion to strike certain portions of the State's expert testimony, (2) the evidence was insufficient to prove beyond a reasonable doubt that he was a sexually violent person, and (3) a number of the conditions of his release infringe upon his constitutional rights. We address each argument in turn.

¶ 55    A. The Motion to Strike Portions of the State's Expert Testimony Was Properly Denied

¶ 56    "[W]hether to allow an expert to present certain opinions" is a decision that "rests solely within the discretion of the trial court and will not be disturbed absent a demonstrated abuse of discretion." *Jones v. Beck*, 2014 IL App (1st) 131124, ¶ 16. An abuse of discretion will only be found "if no reasonable person would take the view adopted by the trial court." *Id.* Where it is argued that the court's exercise of discretion was "frustrated by an erroneous rule of law," however, our review is *de novo*. (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 57    1. The State's Expert Opinions Were Properly Based on Specialized Knowledge

¶ 58    A witness may testify as an expert if his "experience and qualifications provide him with knowledge that is not common to the layperson." (Internal quotation marks omitted.) *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016 IL App (1st) 151864, ¶ 72. In keeping with this principle, Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," then "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Id.*

¶ 59    As noted above, the Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2018). Here, Drs. Kuzia and Travis both opined that Mr. Holt suffered from several mental disorders that were either congenital or acquired. Because they did not specify whether the disorders were congenital or acquired, Mr. Holt claims that the doctors' opinions were not based on specialized knowledge but rather were mere "recitation[s] of the statutory language" and constituted "an end-run around the rules of evidence."

¶ 60    We rejected this argument in *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 56, and held that the Act does *not* require the State to prove with specificity whether a mental disorder is congenital or acquired. A mental disorder *must be* either congenital or acquired, and the Act simply does not require the State to prove which of the two categories applies. *Id.* This reading of the statute does not, as Mr. Holt insists, render the phrase "congenital or acquired" meaningless. "Rather, it acknowledges the intent of the legislature to focus commitment proceedings on persons who have a mental condition that predisposes them toward sexual violence, *regardless of the underlying source of that condition*." (Emphasis added.) *Id.* ¶ 57.

¶ 61    Here, Dr. Kuzia and Dr. Travis provided detailed explanations of their methods, the factors they considered, and their conclusions. The diagnoses they arrived at plainly required specialized knowledge that is not common to a lay person. We affirm the trial court's denial of Mr. Holt's motion to strike their testimony and reports on this basis.

¶ 62    2. The State's Experts Did Not Impermissibly Rely on Their Own Statutory Interpretations

¶ 63    Mr. Holt also argues that the State's experts impermissibly formed their own opinions regarding what is necessary for someone to qualify as "dangerous" under the Act. Mr. Holt is correct that "[s]tatutory interpretation is not a matter to which an expert witness is competent to testify." *Christou v. Arlington Park-Washington Park Race Tracks Corp.*, 104 Ill. App. 3d 257, 261 (1982); see also *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 36 (noting that "no expert is allowed to opine as to the law" because "that is the role of the trial court"). He is also correct that "dangerousness" under the Act is, as it must be, "predicated on the probability of reoffense rather than certainty" and that this kind of predicting raises "constitutional implications." Safeguards built into the Act—including the right to counsel (725 ILCS 207/25(c)(1) (West 2018)), the right to cross-examine witnesses (*id.* § 25(c)(3)), the right to a qualified expert (*id.*

§ 25(e)), the State's burden of proving the allegations in its petition beyond a reasonable doubt (*id.* § 35(d)), and the right to periodic reexaminations at least once every 12 months (*id.* § 55)—are intended to minimize the risk that a person will be subject to the Act based on an erroneous prediction of dangerousness. Mr. Holt was not denied the benefit of these safeguards, and there is nothing in the record suggesting that either of the State's experts made an erroneous or unsupported prediction in this case. Neither doctor improperly opined as to the legal definition of "dangerous," and both doctors properly applied the definition of dangerous in the Act.

¶ 64    To obtain a finding that a person is a sexually violent person, the State is required to prove beyond a reasonable doubt that the person "is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." *Id.* § 15(b)(5). The requirement, as Mr. Holt correctly observes, is stated in the present tense: the State must show that the respondent *is dangerous* at the time of the commitment proceedings, not that he may become dangerous at some later date. But under the Act, a person is dangerous—*presently* dangerous—if he or she suffers from a mental disorder that creates a substantial probability that he or she will engage in acts of sexual violence at some time in the future. See *In re Detention of Samuelson*, 189 Ill. 2d 548, 559 (2000) (noting that involuntary confinement is permissible under the Act "where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence *in the future*" (emphasis added)).

¶ 65    Here, Dr. Kuzia explained that the "statutory threshold for dangerousness is not time limited, whereas the actuarial instruments assess the likelihood of re-arrest, re-charge or re-convictions of a severe crime within a defined time period." According to him, the actuarial instruments, though helpful, thus provide only "conservative predictions." Dr. Travis similarly

opined that "whatever risk assessment we have, if it doesn't go out until a person's death, by logical conclusion, there is some underestimation of risk."

¶ 66 Nothing in the record suggests, as Mr. Holt contends, that the State's experts "relied on a deeply flawed interpretation of the SVP Act" that "relaxed the statutory threshold for dangerousness" or that the State's case was built on "the specter of possible future dangerousness rather than present dangerousness." As our supreme court made clear in *Samuelson*, dangerous means a substantial probability of sexual violence in the future. *Id.* We affirm the trial court's denial of Mr. Holt's motion to strike the experts' testimony on this basis.

¶ 67 B. The Evidence Supports the Court's Finding That Mr. Holt is a Sexually Violent Person

¶ 68 Mr. Holt also argues that the State did not meet its burden of proof in this case. When reviewing a challenge to the sufficiency of the evidence, we consider whether, "viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. We will not reverse a determination that a person is a sexually dangerous person "unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. Nor will we substitute our judgment for that of the trier of fact on the credibility of witnesses or the weight to be given to the evidence. *Id.*

¶ 69 To establish that Mr. Holt was a sexually violent person, the State had to prove beyond a reasonable doubt that he (1) was convicted of a sexually violent offense, (2) presently has a mental disorder, and (3) is dangerous because that mental disorder "makes it substantially probable that [he] will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2018) (defining a "sexually violent person"); see also *id.* § 15(b) (stating what the State must allege in its petition); *id.* § 35(d)(1) (establishing the State's burden of proof). Mr. Holt does not dispute that he was

convicted of a sexually violent offense. He argues that the State failed to establish that he is likely to reoffend due to a mental disorder because its experts did not sufficiently explain their opinions and because they misapplied the relevant risk factors or relied on unexplained and disproven factors to elevate his likelihood of reoffending. We consider each argument in turn.

¶ 70          1. The State's Experts Adequately Explained Their Opinions

¶ 71    Dr. Kuzia and Dr. Travis both diagnosed Mr. Holt with pedophilic disorder, antisocial personality disorder, and substance use disorders. Both indicated that, although his other disorders may have abated in the controlled environment of the DHS temporary detention facility, he still struggled with pedophilic disorder. Mr. Holt argues that these experts did not adequately explain the bases for their diagnoses; that their testimony therefore did not comply with Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), which requires experts to articulate the reasons for their opinions; and that the trial court erred in adopting their insufficiently supported opinions.

¶ 72    In support of this argument, Mr. Holt relies on the plurality decision of our supreme court in *People v. Murray*, 2019 IL 123289. The defendant in that case was convicted of the unlawful possession of a firearm by a street gang member and challenged the opinion of the State's expert that the Latin Kings were a street gang. *Id.* ¶¶ 1, 17. Our supreme court agreed with the defendant that the expert had failed to explain the basis for this conclusion. *Id.* ¶ 34.

¶ 73    The statute in *Murray* specifically defined a street gang as "any combination *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity. 740 ILCS 147/10 (West 2012). A "course or pattern of criminal activity" was further defined as two or more gang-related criminal offenses committed within a specific timeframe, at least one of which was a felony offense. *Murray*, 2019 IL 123289, ¶ 23. The State conceded that its expert had not disclosed the specific

crime evidence that served as the basis for his opinion, and this court rejected its attempt to shift the burden of proof on that issue to the defendant by arguing that his counsel could have drawn the necessary information out on cross-examination. *Id.* ¶¶ 29-30.

¶ 74    The statutory requirements at issue in *Murray* are far different from those in the Act. The doctors here explained the criteria for each of the disorders they believed Mr. Holt suffered from and why he met those criteria. Dr. Kuzia explained the difference between having pedophilia and having pedophilic disorder; only those with the disorder act on their urges. Dr. Kuzia noted in his report that Mr. Holt's awareness of his problem, coupled with multiple sex offenses against children and offenses committed while he was on probation, suggested that he suffered from "an inability to control his sexual urges." Dr. Travis likewise opined that Mr. Holt's "pedophilic disorder drives his behavior" and that he has a sexual interest in prepubescent children that "he is unable to manage adequately *** in the community." This was evidenced, he explained, by the fact that Mr. Holt had "engage[d] in these behaviors even when they [had] resulted in convictions" and "even when he [had] access to adult females." Dr. Travis explained how Mr. Holt's other conditions—his antisocial personality and substance abuse disorders—had a "disinhibitive effect," making it more difficult for him to resist his urges. Dr. Travis also found it significant that, while undergoing treatment, Mr. Holt acknowledged that he had offended against many more victims— 21 in total—than he had previously disclosed. And in 1999, when he committed the offense for which he was most recently incarcerated, he was also grooming several other child victims.

¶ 75    It is clear that the State's experts neither "left the trier of fact to infer too much" nor, as Mr. Holt insists, were incapable of explaining their opinions. As in *Moody*, these experts "did not render summary opinions on a requisite element based merely on unexplained personal familiarity" but instead "extensively testified that the pattern of respondent's behavior documented

in the records they reviewed led directly to their diagnoses." *Moody*, 2020 IL App (1st) 190565, ¶ 53.

¶ 76    Mr. Holt's reliance on *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, does not persuade us otherwise. The respondent in that case was found by the State's expert to have a "statistically 'average risk' of reoffending" based on diagnostic instruments. *Id.* ¶ 12. He scored a "3" on the Static 99-R risk assessment tool, a score associated with only an 8-10% chance of recidivism after five years. *Id.* ¶ 28. The expert nevertheless concluded, based on her evaluation of a number of dynamic factors unique to the respondent, that it was substantially probable that he would reoffend. *Id.* ¶¶ 12, 29. This court concluded that the State "left too much to inference" when questioning the expert and that the expert was never prompted to provide a solid explanation for why the respondent's risk of reoffence was substantial. *Id.* ¶ 42. In this case both experts found that Mr. Holt had a high risk of reoffending based on diagnostic instruments, and their analysis of the dynamic factors simply confirmed that risk assessment.

¶ 77    2. The Evidence Supports the Experts' Application of the Relevant Risk Factors

¶ 78    Again adopting the framework of our analysis in *McCormack* and attempting to fit it to the facts of this case, Mr. Holt argues that Dr. Kuzia and Dr. Travis misapplied certain dynamic risk factors, failed to explain others, and considered factors that were shown on cross-examination to have no application in this case. We disagree.

¶ 79    Dr. Kuzia concluded in his report that Mr. Holt's participation in sex offender treatment while in prison was not a protective factor because Mr. Holt had stopped attending treatment sessions. At trial, Dr. Travis agreed that *completion* of treatment was associated with reduced recidivism but was unaware of any data suggesting that treatment short of completion had a similar effect. He explained that there are five stages of sex offender treatment and—at the time the court

determined that Mr. Holt was a sexually violent person—he was in the third stage of that process. Although Mr. Holt's counsel demonstrated on cross-examination that Dr. Kuzia was unfamiliar with the precise nature of the treatment Mr. Holt received in prison and mistaken about the number of treatment sessions he attended while incarcerated, it cannot be disputed that at the time the court made its determination, completion of a sex offender treatment program was not a protective factor reducing Mr. Holt's significant baseline risk of recidivism. Nothing in the record indicates that the State's experts misapplied this factor.

¶ 80     Mr. Holt argues that "[t]here was no testimony that *failure* to complete treatment *increases* risk" (emphasis added). That is true, but not relevant. Actuarial tools had already placed Mr. Holt at the highest level of risk, and his failure to complete treatment did not lower that risk.

¶ 81     Mr. Holt's argument that the State's experts "could offer no explanation as to how [certain] factors increased [his] risk to reoffend" and could not quantify the risk associated with any one factor—likewise misses the mark. Mr. Holt criticizes Dr. Kuzia for concluding, based on his probation violation and inmate disciplinary reports he received while incarcerated, that "[r]esistance to rules in supervision" was a factor that applied to Mr. Holt, while giving inadequate consideration to the fact that he had not been accused of any rule violations in three years at DHS's temporary detention facility. Mr. Holt likewise criticizes Dr. Kuzia for concluding that he exhibited "lifestyle impulsivity," based on the fact that he was a self-described nonfunctional alcoholic and could not recall the last job he held before his incarceration. Mr. Holt points out that he in fact did hold down a job at a health club for six years and notes that he could not specifically recall his last job because, as he went on to state, he was working a number of different construction jobs at the time. In our view, there was at least some support for the expert's application of each of these factors, and the countervailing facts explored on cross-examination go merely to the

weight of the evidence supporting the expert's testimony. Mr. Holt's argument that Dr. Travis oscillated between using "treatment dropout" as a risk factor and abandoning it as untrustworthy also misstates the doctor's testimony. Dr. Travis made clear that he did not consider the fact that Mr. Holt voluntarily withdrew from treatment while in prison as a risk-enhancing factor because there was no reliable data on how much that might increase his overall risk of reoffending. There *was* data on how the completion of treatment decreases risk, and so Dr. Travis did consider that as a potential *protective* factor.

¶ 82    The State's experts adequately explained their opinions, they did not misapply the relevant factors, and a rational trier of fact could find that the State met its burden in this case.

¶ 83                              C. Conditions of Release

¶ 84    Mr. Holt's final argument is that a number of the conditions in his conditional release plan should not have been approved by the trial court because they infringe upon his constitutional rights and do not reasonably relate to the Act's purpose. The parties agree that there is no Illinois Appellate Court case that has reviewed conditions of release under the Act.

¶ 85    The State insists that Mr. Holt affirmatively waived his objections to the conditions in his release plan when, following his commitment hearing, he "reviewed the plan, initialed each condition, and signed the plan, indicating that he understood and agreed to abide by the conditions." When court reconvened and Mr. Holt's lawyer raised objections to the conditions, the State argued that it was too late for him to do so and that Mr. Holt should have raised any concerns he had with his treatment team before signing the document.

¶ 86    We are not persuaded by the State's argument on this point. As Mr. Holt points out, his appointed lawyer was not present when he signed and initialed the lengthy conditional release plan prepared by DHS and Liberty Healthcare, and his lawyer objected to the plan at the parties' next

court appearance. The Act expressly provides that a person the State has petitioned to be adjudged a sexually violent person has the right to counsel and to appointed counsel if indigent. 725 ILCS 207/25(c) (West 2018). It also provides that a conditional release plan prepared by DHS is subject to court approval and, to take effect, must be entered as a court order. *Id.* § 40(b)(3). We reject the State's insistence that any modifications to DHS's proposed conditions had to be negotiated directly between Mr. Holt and DHS, without the help of his counsel or any oversight by the court. Participation by the court and by Mr. Holt's counsel was part of the required process.

¶ 87    The State also suggests there was waiver because Mr. Holt and his counsel ultimately agreed to entry of the conditional release plan at the hearing, despite their objections to certain conditions. As Mr. Holt's lawyer pointed out at oral argument, however, without entry of a conditional release order, Mr. Holt would have remained in "institutional care in a secure facility." *Id.* § 40(b)(2). We reject the State's suggestion that Mr. Holt needed to remain in DHS custody pending this appeal to preserve his objections to certain conditions of release.

¶ 88    Finally, to the extent that the State attempts to recast its waiver argument as a complaint that it was not afforded an adequate opportunity to respond to Mr. Holt's objections, we reject that as well. The trial court specifically told the assistant attorney general representing the State that it would give her additional time to respond to Mr. Holt's oral objections if needed. The State did not request any additional time. Nor did it ask for briefing or further proceedings before the court ruled on the objections. If the State feared that, as written, the conditions might be stricken on appeal, it could have asked to submit revised conditions for the court's consideration. It did not. In sum, the State has not convinced us that there is anything about the proceedings below that prevent Mr. Holt from asserting the challenges he now raises on appeal.

¶ 89    We next address the proper standard of review. We agree with the State that a trial court's

decisions concerning the conditional release of a sexually violent person should generally be reviewed for an abuse of discretion. *Cf. In re J.W.*, 204 Ill. 2d 50, 77 (2003) (recognizing that "courts have broad discretion to impose probation conditions, whether expressly allowed by statute or not, to achieve the goals of fostering rehabilitation and protecting the public"); see also *People v. Vercolio*, 363 Ill. App. 3d 232, 237 (2006) (applying this standard when considering whether conditions of release for a sexually dangerous person under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq.* (West 2002)) were excessive). As we have explained, however, under this umbrella of abuse of discretion, we must apply other standards of review, depending on whether the underlying issue is one of fact or law. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 24. Here, there are constitutional safeguards "which circumscribe a trial court's exercise of its discretion to impose conditions" (internal quotation marks omitted) (*In re J.W.*, 204 Ill. 2d at 77), and "[t]he standard of review for determining whether an individual's constitutional rights have been violated is *de novo*" (internal quotation marks omitted) (*In re J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 11). These overlapping standards may be distilled into a single consideration. As our supreme court has made clear, the "overriding concern is reasonableness," and "[t]o be reasonable, a condition of probation must not be overly broad when viewed in the light of the desired goal or the means to that end." *In re J.W.*, 204 Ill. 2d at 78. While the court stated this in reference to conditions of probation, the imposition of conditions on the release of sexually violent persons raises similar balancing concerns.

¶ 90        1. Condition 33 Must Be Revised To Allow Reasonable Internet Access

¶ 91    Applying this standard, we first consider Mr. Holt's challenge to condition 33 of his conditional release plan, which he argues unconstitutionally restricts his protected first amendment (U.S. Const., amend. I) conduct. Condition 33 requires that Mr. Holt

"33. Not possess any computer or tablet and shall not have any direct or indirect internet access through any TV, any type of phone, computer, watch, tablet, video gaming device or any electronic device capable of accessing the internet; you shall not use the internet at any residence or any other location including but not limited to places of employment, retail stores, grocery stores, restaurants, coffee shops, libraries, and schools; you shall not use any Wi-Fi connections or hotspots; if you are found in possession of a computer, tablet or other electronic device in your residence or elsewhere, you shall consent to a forensic evaluation of the computer, tablet or other device, and all peripheral components, hardware and software that may be installed on the computer, tablet, or other device; any type of phone including a smart phone found at your residence shall be confiscated and a forensic check may be made at the request of the LHC agent."

¶ 92    Because no Illinois court has yet reviewed the propriety of conditions imposed on a sexually violent person granted conditional release, Mr. Holt urges us to be guided by principles established in criminal cases considering conditions of probation. We agree that the reasoning in such cases is relevant here. We also agree with the State, however, that it will sometimes be necessary to impose greater restrictions on sexually violent persons than on criminal defendants released on probation. See *People v. Parrott*, 244 Ill. App. 3d 424, 431 (1993) (noting that "[d]efendants on probation are not mentally ill" and generally do not "represent a significant threat to the public"). With this in mind, we still find *People v. Morger*, 2019 IL 123643, the authority relied on by Mr. Holt, helpful in considering the reasonableness of Internet use restrictions.

¶ 93    The defendant in *Morger* was convicted of aggravated criminal sexual abuse against his teenage sister. *Id.* ¶ 6. He was evaluated at presentencing and found to have " 'a moderate to high risk' " of reoffending, though it was " 'likely' " that he could be safely treated in the community

if he had appropriate supervision. *Id.* A number of conditions were ultimately imposed on the defendant's four-year sentence of probation, including a statutorily mandated prohibition on the use of social media. *Id.* ¶ 24. Our supreme court began by recognizing that a condition "that impinges on fundamental constitutional rights is not automatically deemed invalid," because "even fundamental constitutional rights *** may be reasonably restricted in the public interest." *Id.* ¶ 19. To be considered reasonable, however, such a condition "must not be overly broad when viewed in the light of the desired goal or the means to that end." (Internal quotation marks omitted.) *Id.* Appropriate considerations included (1) "whether the restriction [was] related to the nature of the offense or the rehabilitation of the probationer"; (2) "whether the condition of probation reasonably relate[d] to the rehabilitative purpose of the legislation"; (3) "whether the value to the public in imposing th[e] condition *** outweigh[ed] the impairment to the probationer's constitutional rights"; and (4) "whether there [were] any alternative means that [were] less subversive to the probationer's constitutional rights." (Internal quotation marks omitted.) *Id.* Applying these factors, the *Morger* court concluded that a complete ban on the use of social media was unconstitutionally overbroad and unreasonably restrictive of the defendant's first amendment rights.

¶ 94 The restriction in *Morger* was not related to the nature of the offense or the rehabilitation of the defendant in that case because his crimes were ones of "opportunity and convenience," he had not sought out his victims through social media, and there was nothing to suggest that he would do so in the future. *Id.* ¶ 48. The restriction imposed was not "narrowly drawn" because it broadly swept up innocent conduct. *Id.* ¶¶ 50, 54, 58. The *Morger* court concluded that, in its "absolute form," the protective value of the social media ban "[did] not manifestly outweigh the impairment to the probationer's constitutional rights." *Id.* ¶ 54. This was particularly so, the court explained,

where there were obvious alternative means of controlling his use of social media that infringed less on his constitutional rights. *Id.* ¶ 55. The court noted that the defendant was already prohibited from contacting minors over the Internet and his probation officer already had "broad oversight of [his] access to, or use of, any device with Internet capability," including the right to preapprove use, make unannounced examinations of devices, and install hardware or software to monitor his Internet use. *Id.* ¶ 56.

¶ 95    We agree with Mr. Holt that the same factors weigh in favor of a finding here that condition 33 is overly broad and unreasonably restrictive. Like the defendant in *Morger*, Mr. Holt has never attempted to use the Internet to seek out victims. Although, as the State notes, he has been incarcerated or in DHS custody for the past two decades, the Internet did exist before that time. There may be cases—where the person granted conditional release has a history of identifying and communicating with victims online or is particularly adept at evading monitoring or controls, for example—where extreme Internet use restrictions will be reasonable. Nothing in the record here indicates that this is such a case.

¶ 96    Here, as in *Morger*, the challenged condition also broadly sweeps up whole categories of innocent conduct. The Act requires DHS to arrange for the control, care, and treatment of sexually dangerous persons "in the least restrictive manner" possible. 725 ILCS 207/40 (West 2018). Implicit in this requirement, we believe, is the notion that conditions of release must afford individuals a practical, and not merely a theoretical, opportunity to live a productive life. We live in an age where much of our lives are online. Meetings, including therapy sessions and Alcoholics Anonymous meetings, court hearings, and job interviews, are increasingly accomplished remotely. Many jobs now also permit or even require individuals to work remotely from home. Barring an individual completely from these opportunities implicates not just the first amendment right to free

speech but the rights to "free assembly and free association" and the right "to acquire, own, enjoy and dispose of property," rights our supreme court has acknowledged are necessarily curtailed when an individual is barred from entering a particular geographic location. (Internal quotation marks omitted.) *In re J.W.*, 204 Ill. 2d at 77-78. Barring someone completely from the Internet effectively condemns him or her to a shadow existence in our present society. In the case of someone like Mr. Holt, it could also deprive him of important resources that may aid in his recovery and assist him in complying with the other restrictions that have been imposed on him.

¶ 97 The State is rightly concerned, of course, that unrestricted access to the Internet is a massive temptation for sex offenders. But here, as in *Morger*, there are many ways for Mr. Holt's conditional release team to monitor and restrict his Internet use. Mr. Holt's plan already provides that he must submit to searches (condition 10); refrain from all contact with minors absent prior approval (condition 17); not possess pornographic material obtained through access to the Internet (condition 20); provide a daily log of his activities (condition 27); not possess, purchase, or borrow a cell phone without prior approval or make calls outside of an approved call list (condition 39); not make purchases of any kind without authorization (condition 53); and be "monitored continuously (24 hours a day/7 days a week) by GPS." Condition 28, discussed in more detail below, also authorizes Mr. Holt's team to impose "other special conditions" that it may deem necessary to limit his access to potential victims.

¶ 98 Contrary to the State's insistence at oral argument, Internet use need not result in "instant access" to victims or to content that might interfere with Mr. Holt's treatment. The State certainly has the ability to limit Mr. Holt to "user only" privileges on preapproved devices and to thereby prevent him from installing or removing software or deleting or altering his browsing history. His access to the Internet could also be quite restricted, at least at first, with access to certain blacklisted

websites denied outright and approved sites added only on a case-by-case basis to a curated whitelist.

¶ 99     Given these alternatives, a complete ban on Mr. Holt's use of the Internet is overly broad and unreasonably restrictive. On remand, DHS should redraft condition 33 in a manner consistent with this opinion for the trial court's consideration.

¶ 100          2. We Reject Mr. Holt's Other Challenges to His Conditions of Release

¶ 101   We find Mr. Holt's other challenges unpersuasive. We agree with the State that the requirements of conditions 24 and 61 (requiring Mr. Holt to obtain permission before publishing materials or having contact with the media) "strike a reasonable balance between his First Amendment right, his therapeutic needs, and security concerns." Mr. Holt has cited no Illinois case in which a condition of release was held to be a prior restraint, and we have recognized, in the context of juvenile probation, that while individuals "do not lose their first-amendment rights entirely upon conviction or adjudication, *** they *can* be censored more liberally than, say, a newspaper protecting the public's interest in open and transparent judicial proceedings, provided that the censorship reasonably relates to the rehabilitative goals of the probation." *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 58. This principle applies no less here, where the State has a legitimate interest in limiting Mr. Holt's ability to communicate with potential victims, which he could do by reaching out to them through the media or by publishing. See *Packingham v. North Carolina*, 582 U.S. ___, ___, 137 S. Ct. 1730, 1737 (2017) (recognizing the legitimate state interest of prohibiting a sex offender from "engaging in conduct that often presages a sexual crime"). There is a rational connection between that interest and this relatively limited restriction.

¶ 102   Condition 41 (prohibiting Mr. Holt, unless approved by LHC, from leaving his home on holidays, passing out candy to trick-or-treaters, participating in Easter egg hunts, or answering his

door to children for any reason) and condition 57 (forbidding him from having contact with animals or visiting zoos, circuses, or other places in which animals are used to attract children) are rationally related to this same goal. We disagree with Mr. Holt that these represent "arbitrary blanket restraints" on his conduct. Mr. Holt acknowledged during therapy that he lured a five-year-old victim into his home with promises that she could see his pet fish. He further acknowledged that, at the same time, he was grooming several other children as potential future victims.

¶ 103   We also reject the argument that the phrase "any function or any other holiday" in condition 41 is impermissibly vague. As the State points out, although not all holidays are typically associated with children, any holiday involving a school closure will mean that more children will be present in the neighborhood. If Mr. Holt is unsure whether a function or holiday is covered by the condition, he can and should discuss it in advance with his conditional release team.

¶ 104   Condition 28 (allowing Mr. Holt's team to impose other specific conditions as necessary) and condition 66 (requiring him to "take an active role" in ensuring his compliance) are also not unconstitutionally vague. A requirement violates due process principles if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926). As the State points out, condition 28 is nearly identical to a condition mandated by section 40(b)(5)(BB) of the Act. 725 ILCS 207/40(b)(5)(BB) (West 2018). Just as the Act gives DHS the ability to grant exceptions to various conditions of release (see, *e.g.*, *id.* § 40(b)(5)(I), (N), (Y), (V)), here it also gives the agency the necessary flexibility to formulate additional conditions as the need for them may arise. This does not, as Mr. Holt insists, give DHS "the unilateral ability to impose new conditions as they see fit without any judicial oversight." If and when new conditions are imposed, Mr. Holt may challenge them at that time. The parties

agreed at oral argument in this appeal that the trial court retains jurisdiction under the Act to, among other things, conduct periodic reexaminations of the respondent's status as a sexually violent person (see *id.* § 55 (requiring such periodic reexaminations)). At this juncture, however, any challenge to a condition of release that has not yet been imposed on Mr. Holt is premature.

¶ 105   Nor does condition 66, as Mr. Holt insists, unreasonably place the onus on him to investigate the acceptability of activities he may wish to engage in. It also does not permit DHS to arbitrarily condemn an activity "after the fact" that is not explicitly prohibited by the conditional release plan. Rather, we agree with the State that this condition is designed to protect *against* arbitrary enforcement by facilitating discussions that will lead to Mr. Holt having definitive answers to any questions that may arise regarding the plan's provisions before he engages in activities that could be considered violations. Requiring Mr. Holt to actively participate in his compliance by seeking clarification where necessary to do so is a reasonable condition of his release and does not violate his right to due process.

¶ 106   D. The Role of the Court and Counsel In Formulating Conditional Release Plans

¶ 107   As we made clear in our rejection of the State's argument that Mr. Holt had forfeited his objections to the conditions of his release (*supra* ¶ 86), the court and counsel have an important role in fashioning conditional release plans under the Act. Going forward in these cases, we encourage counsel for both parties and the court to take a more active role in shaping the conditions of release to the particular circumstances of a case. As the trial court noted here, DHS drafted an incredibly onerous and burdensome list of conditions for Mr. Holt. Apparently presuming that briefing and extensive argument would be pointless, counsel for Mr. Holt then made a handful of objections to those conditions "just *** for the record," and the trial court, without expressly addressing any of those objections, approved the plan as drafted.

¶ 108   Although the Act sets out 28 conditions that all individuals adjudged to be sexually violent persons must abide by on conditional release, additional conditions may only be imposed by court order. 725 ILCS 207/40(b)(5) (West 2018) (providing that "the person be subject to the following rules of conditional release, *in addition to any other conditions ordered*" (emphasis added)). Which additional conditions may be proper in a given case is thus a decision for the court to make.

¶ 109   In our view, part of the role of Mr. Holt's appointed counsel was to aid him by making objections to DHS's conditions. The court and the State would both be better able to respond to such objections if they were provided by counsel in writing in advance of the hearing to approve the conditional release plan. A procedure that includes written objections, argument, and redrafting of conditions as necessary, in an expedited way that will not unduly delay release from institutional confinement, will assist the trial court in this important exercise of its discretion and help to ensure that the conditions imposed meet the Act's requirement that the control, care, and treatment of a sexually violent person be accomplished "in the least restrictive manner" possible. *Id.* § 40(b)(2).

¶ 110                                    IV. CONCLUSION

¶ 111   For the above reasons, we affirm the trial court's adjudication of Mr. Holt as a sexually violent person. We remand for modification of condition 33 in a manner consistent with this opinion.

¶ 112   Affirmed in part and reversed in part.

¶ 113   Cause remanded.


¶ 114   JUSTICE ODEN JOHNSON, concurring in part and dissenting in part:

¶ 115   I concur with the majority's findings (1) that the trial court properly denied respondent's motion to strike portions of the State's experts' testimony, (2) that the evidence was sufficient to

prove beyond a reasonable doubt that respondent was a sexually violent person, (3) that respondent did not waive his objections to his conditional release plan,[1] and (4) that, as written, condition 33 is overbroad and violates the first amendment by prohibiting respondent from possessing any computer or tablet and prohibiting him from accessing the Internet at any time, for any reason.

¶ 116   However, respondent raised another issue that I find persuasive. In his brief to this court, respondent argued that the trial court erred by imposing numerous conditions that were unreasonable and had no relationship to him. As examples, respondent identified seven conditions that were "particularly" unreasonable, to which the majority limited its consideration.[2] Respondent also argued that "[t]he absence of any relationship" between of the conditions of his release plan and the specific facts of his case demonstrated that the plan contained "blanket restrictions that are routinely imposed in conditional release plans without regard to factual circumstances of the cases." In support, respondent cited several cases in which these blanket restrictions were routinely applied.

¶ 117   Respondent argued that, in the case at bar, "the trial court erred by imposing blanket conditions of conditional release" that had no relationship to treating respondent. As relief, respondent asked this court to "reverse the judgment of the circuit court and remand for the imposition of a new conditional release plan."

¶ 118   Here is where I differ from the majority. In addition to the modification for condition 33 of the plan, I would remand for the imposition of an entirely new conditional release plan drawn

---

[1]As the majority notes (*supra* ¶ 87), respondent's only alternative to signing the plan, at that moment, was to reject release and remain an undetermined and indefinite time in prison. I agree with the majority that we must reject the State's argument that he needed to remain in custody to pursue an appeal. S*upra* ¶ 87. As an additional reason for not finding waiver, I would add that, so long as respondent refused to agree to the entry of the release plan, there was no final order for him to appeal.

[2]The majority observed that the Department "drafted an incredibly onerous and burdensome list of conditions for Mr. Holt. Apparently presuming that briefing and extensive argument would be pointless, counsel *** made a handful of objections *** 'just *** for the record.' " *Supra* ¶ 107.

specifically to the treatment of this respondent, but not affecting the 28 statutorily mandated conditions.

¶ 119  Respondent's "Conditional Release Plan" is in the appellate record and appears to be a preprinted generic or stock form. The bottom of each page states "Revised 7/2019." Although the form states that it was last revised by the Department in July 2019, the trial court did not order the Department to prepare a conditional release plan for respondent until March 4, 2021.

¶ 120  Respondent's release plan contains both statutorily required conditions and additional conditions. The Sexually Dangerous Persons Act lists 28 conditions that "shall" be imposed on every sexually violent person (SVP) who is conditionally released. 725 ILCS 207/40(b)(5) (West 2018). Specifically, the Act states: "The court shall order the person be subject to the following rules of conditional release ***." *Id.* The 28 statutorily mandatory conditions require that the SVP

"(A) not violate any criminal statute of any jurisdiction;

(B) report to or appear in person before such person or agency as directed by the court and the Department;

(C) refrain from possession of a firearm or other dangerous weapon;

(D) not leave the State without the consent of the court or, in circumstances in which the reason for the absence is of such an emergency nature, that prior consent by the court isnot possible without the prior notification and approval of the Department;

(E) at the direction of the Department, notify third parties of the risks that may be occasioned by his or her criminal record or sexual offending history or characteristics, and permit the supervising officer or agent to make the notification requirement;

(F) attend and fully participate in assessment, treatment, and behavior monitoring including, but not limited to, medical, psychological or psychiatric treatment specific to

sexual offending, drug addiction, or alcoholism, to the extent appropriate to the person

based upon the recommendation, and findings made in the Department evaluation or

based upon any subsequent recommendations by the Department;

(G) waive confidentiality allowing the court and Department access to assessment

or treatment results or both:

(H) work regularly at a Department approved occupation or pursue a course of

study or vocational training and notify the Department within 72 hours of any change in

employment, study, or training;

(I) not be employed or participate in any volunteer activity that involves contact

with children, except under circumstances approved in advance and in writing by the

Department officer;

(J) submit to the search of his or her person, residence, vehicle, or any personal or

real property under his or her control at any time by the Department;

(K) financially support his or her dependents and provide the Department access

to any requested financial information;

(L) serve a term of home confinement, the conditions of which shall be that the

person;

(i) remain within the interior premises of the place designated for his or

her confinement during the hours designated by the Department;

(ii) admit any person or agent designated by the Department into the

offender's place of confinement at any time for purposes of verifying the person's

compliance with the condition of his or her confinement;

(iii) if deemed necessary by the Department, be placed on an electronic monitoring device;

(M) comply with the terms and conditions of an order of protection issued by the court pursuant to the Illinois Domestic Violence Act of 1986. ***;

(N) refrain from entering into a designated geographic area except upon terms the Department finds appropriate. ***:

(O) refrain from having any contact, including written or oral communications, directly or indirectly, with certain specified persons, including, but not limited to, the victim or the victim's family, and report any incidental contact with the victim or the victim's family to the Department within 72 hours ***:

(P) refrain from having any contact, including written or oral communications, directly or indirectly, with particular types of persons, including but not limited to members of street gangs, drug users, drug dealers, or prostitutes;

(Q) refrain from all contact, direct or indirect, personally, by telephone, letter, or through another person, with minor children without prior identification and approval of the Department;

(R) refrain from having in his or her body the presence of alcohol or any illicit drug prohibited by the Cannabis Control Act, the Illinois Controlled Substances Act, or the Methamphetamine Control and Community Protection Act, unless prescribed by a physician, and submit samples of his or her breath, saliva, blood, or urine for tests to determine the presence of alcohol or any illicit drug;

(S) not establish a dating, intimate, or sexual relationship with a person without prior written notification to the Department;

(T) neither possess or have under his or her control any material that is pornographic, sexually oriented, or sexually stimulating, or that depicts or alludes to sexual activity or depicts minors under the age of 18, including but not limited to visual, auditory, telephonic, electronic media, or any matter obtained through access to any computer or material linked to computer access use;

(U) not patronize any business providing sexually stimulating or sexually oriented entertainment nor utilize '900' or adult telephone numbers or any other sex-related telephone numbers;

(V) not reside near, visit, or be in or about parks, schools, day care centers, swimming pools, beaches, theaters, or any other places where minor children congregate without advance approval of the Department and report any incidental contact with minor children to the Department within 72 hours;

(W) not establish any living arrangement or residence without prior approval of the Department;

(X) not publish any materials or print any advertisements without providing a copy of the proposed publications to the Department officer and obtaining permission prior to publication:[3]

(Y) not leave the country except with prior permission of the Department and provide the Department officer or agent with written travel routes to and from work and any other designated destinations;

---

[3]Statutory condition X is condition 24 of respondent's plan. Of the 7 conditions that respondent identified as particularly unreasonable, only 2 are in the statute itself: (1) condition 24 and (2) condition 28, which merely authorizes the addition of other conditions. (Condition 28 of respondent's plan is condition BB in the statute.) 725 ILCS 207/40 (b)(5)(X), (BB) (West 2018).

(Z) not possess or have under his or her control certain specified items of contraband related to the incidence of sexually offending items including video or still camera items or children's toys;

(AA) provide a written daily log of activities as directed by the Department;

(BB) comply with all other special conditions that the Department may impose that restrict the person from high-risk situations and limit access or potential victims." *Id.*

¶ 121 In addition to this lengthy list of mandatory conditions, the statute permits the Department to draft a plan that imposes additional conditions. *Id.* (permitting "other conditions"). However, the Act provides that "[t]he Department *shall* arrange for control, care and treatment of the person *in the least restrictive manner* consistent with the requirements of the person and in accordance with the court's commitment order." (Emphasis added.) *Id.* § 40(b)(2).[4] In the case at bar, the first 28 conditions in respondent's release plan are the 28 mandatory conditions, but with further conditions added. For example, condition 26 in respondent's plan is the same as condition Z listed above, except that condition 26 further prohibits respondent from possessing a "smart phone[ ]." In addition to some version of the 28 statutorily required conditions, respondent's plan contains 38 more conditions, which are conditions 29 through 66 of his plan, none of which were specific to respondent.

¶ 122 The blanket application of additional boilerplate conditions to an entire class of offenders means that the conditions are *not* being drawn to be "the least restrictive" for a particular respondent, as the statute requires. *Id.* Where a plan so clearly violates the plain language of the

---

[4]The statute refers to both a commitment order and an order for conditional release. In the commitment order, the court determines whether the person is a sexually violent person who needs "to be committed to the custody of the Department for control, care and treatment" (725 ILCS 207/40(a) (West 2018)) and, if so, whether the person shall be in "institutional care in a secure facility" or on "conditional release" (*id.* § 40(b)(2)). The "order for conditional release" details the rules and conditions of the SVP's release, if permitted. *Id.* § 40(b)(5).

statute and the first amendment, as in condition 33, I would remand and order the Department to devise an individuated plan for this particular respondent that is "the least restrictive," as the statute requires. *Id.*; see also *People v. Morger*, 2019 IL 123643, ¶¶ 48, 58 (finding facially unconstitutional a statutory condition for a convicted sex offender on probation that prohibited him from accessing all social media, particularly where "nothing" suggested that the defendant had used "the Internet to find and molest children"). Further, I would require the Department to devise and submit a plan in no more than 6 months from the date of this opinion, as respondent is continually prejudiced as long as he is without an individuated plan.

¶ 123    For the foregoing reasons, I must concur in part and dissent in part.

***In re Commitment of Holt*, 2022 IL App (1st) 210402**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-80004; the Hon. Michael Clancy, Judge, presiding. |
| **Attorneys for Appellant:** | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Katherine M. Doersch and Jason F. Krigel, Assistant Attorneys General, of counsel), for the People. |