2023 IL App (1st) 221303-U
No. 1-22-1303

FIRST DIVISION
December 11, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN RE COMMITMENT OF WARDELL JACKSON, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 15 CR 80005 |
| v. | ) ) | The Honorable Arthur Willis, |
| WARDELL JACKSON, | ) ) | Judge Presiding. |
| Respondent-Appellant. | ) ) | |

JUSTICE Pucinski delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The jury's decision finding respondent to be a sexually violent person under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2018)), is affirmed. The evidence established that respondent was a sexually violent person, respondent was not denied his right to a fair trial by the State's comments during opening statement and closing arguments, and the trial court properly declined to include a non-pattern jury instruction regarding the basis of opinion testimony by expert witnesses.

¶ 2    After a jury trial, respondent Wardell Jackson was found to be a sexually violent person

pursuant to the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.*

(West 2018). The circuit court committed respondent to the Illinois Department of Human Services (IDHS). In this appeal, respondent asks this court to find that he was not proven guilty beyond a reasonable doubt, to find that the State compromised his right to a fair trial by making several improper comments during opening statements and closing arguments, and to find that the trial court erred in refusing to instruct the jury as to a non-IPI jury instruction where the pattern jury instruction did not accurately state the law regarding the consideration of basis of opinion testimony by expert witnesses.

¶ 3                                                    BACKGROUND

¶ 4        On September 15, 2015, the State petitioned to commit respondent as a sexually violent person pursuant to the SVP Act. On February 24, 2022, a jury found respondent to be a sexually violent person. Following a dispositional hearing on August 8, 2022, the trial court found that the least restrictive environment for respondent to be safely and effectively managed and treated would be a residential sex offender treatment program through the Illinois Department of Corrections (IDOC) and IDHS.

¶ 5        Prior to trial, respondent filed a motion *in limine* to provide a non-IPI limiting jury instruction concerning the basis of opinion testimony. In this motion, respondent argued that Illinois Pattern Jury Instruction, Civil, No. 2.04 (IPI No. 2.04) "is intended to prevent the jury from considering the basis of opinion testimony for an improper purpose, but it misses the mark" because it does not instruct the jury that they must not consider basis of opinion testimony for its truth. In support, respondent cited to *In re Commitment of Gavin*, 2014 IL App (1st) 122918, and *In re Commitment of Montanez*, 2020 IL App (1st) 182239. In turn, the State argued that a pattern jury instruction should be used unless that instruction is found to be an inaccurate statement of law and, in these two cases, the court, while critical of IPI No. 2.04, did not say that this pattern jury instruction was

an inaccurate statement of law. The trial court denied respondent's motion, finding that the courts in Illinois have never stated that the trial court should not follow the pattern jury instruction.

¶ 6        Respondent's jury trial commenced on February 22, 2022. At trial, two experts, Doctor John Arroyo and Doctor Kimberly Weitl, testified for the State. Doctor Luis Rosell testified as an expert for the respondent. Before each of the experts testified, the trial court read the following modified IPI 2.04, to the jury:

> "….I'm allowing the witness to testify in court to materials including, but not limited to, police reports, Department of Corrections records, Department of Human Services' records, psychological evaluations, psychological testing, psychological articles and statements other than those made by the respondent to the witness."

> "None of this material has been admitted into evidence. The testimony will be allowed for a limited purpose. It will be allowed so that the witness may tell what he or she relied on to form his or her opinion. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give to the opinions testified to by this witness."

¶ 7                              Doctor John Arroyo

¶ 8        Doctor Arroyo, a licensed clinical psychologist and a sexual violent person evaluator, testified for the State as an expert in the field of evaluation, diagnosis, and risk assessment for sexually violent persons. In 2015, he conducted a clinical evaluation of respondent. He first reviewed respondent's file, which contains information such as the Statement of Facts written by an assistant state's attorney to IDOC following conviction and sentencing, police reports, grand jury testimony, medical information, and disciplinary records from IDOC. His review also included looking at respondent's criminal history and behaviors for offenses for which respondent was charged but

not convicted, including non-sexual offenses. He testified that these are the types of records that experts in his field reasonably rely on in conducting sex offender evaluations. He explained that he reviewed these records to determine whether there were any similarities with these offenses and if they could be attributed to a mental disorder. Also, with respondent's consent, he interviewed him on August 11, 2015.

¶ 9     At trial, Doctor Arroyo outlined defendant's criminal history involving sex offenses. Defendant had two prior convictions involving sex offenses:

- In case 07 CR 9084, defendant was charged with 24 counts of aggravated criminal sexual assault (ACSA) and four counts of criminal sexual assault (CSA). He pled guilty to one count of ACSA and was sentenced to 11 years' imprisonment. He learned that the victim had been walking home alone when respondent approached her on a bicycle, dropped the bicycle, produced a handgun, patted her pockets for money, forced her to go into an abandoned building. He grabbed her by the head and forced her to perform oral sex, forced her to remove her clothing, lie down on top of her coat, and vaginally penetrated her with his penis. He then told her to turn over and spread her legs wide and inserted the barrel of the handgun into her rectum, causing the victim to scream in pain and almost pass out. Respondent grabbed her by the hair, threatened her with the handgun, and told her to shut up. He then penetrated her anally with his penis and ejaculated inside her. Afterwards, he took the victim's money and cigarettes and fled. The victim called the police. At the hospital, the victim had emergency surgery to her rectum, and DNA was subsequently recovered. That DNA "matched" that of respondent, and the victim later identified respondent as the offender. Doctor Arroyo determined that this conviction qualified as a sexually violent conviction under the Act.

- In case number 07 CR 8846, defendant was charged with eight counts of ACSA and two counts of CSA. He pled guilty to one count of ACSA and was sentenced to six years' imprisonment consecutive to the other case. Doctor Arroyo learned that the victim was walking towards a CTA train station when respondent drove by, jumped out of his car, grabbed the victim by the hair, punched her, and forced her into the car. Respondent told her to get into the back seat of the car. He parked the car in the alley, told her to remove her clothing, and tied "rubber tubing" around her mouth to prevent her from screaming. He scratched her chest with his finger and threatened to kill her. He vaginally and anally penetrated her with his penis and ejaculated. Afterwards, he forced her out of the car and the victim flagged down a police officer. At the hospital, DNA was recovered which "matched" respondent's DNA. Doctor Arroyo determined that this conviction qualified as a sexually violent conviction under the Act.

¶ 10    Doctor Arroyo learned that there were three cases in which respondent was charged, but not convicted.

- In 1993, respondent was arrested and charged with ACSA, burglary, criminal trespass to residence, and battery. The police report for this case "crossed out" the offenses of ACSA and burglary. The victim identified him as the person she found in her bed, fondling her leg. When she tried to escape, he grabbed her and told her to lie down, and threatened to kill her and her children if she screamed. When the victim's brother appeared, respondent fled. The doctor learned that this case had been "stricken."

- In 1998, respondent was arrested for criminal sexual abuse after the victim identified him as the person who attempted to knock her down in an alley and grabbed her breasts and

vaginal area. When she fought back, he struck her several times, but he eventually fled on a bicycle. The doctor learned that this case was "stricken."

- In Georgia in 2001, respondent was charged with rape and aggravated sodomy. The victim told police that she was walking back from her apartment when respondent approached her on a bicycle. He asked her if she smoked, she said no, and continued to walk. As she was walking, she felt something pressed against her back. Respondent grabbed her by the arm, told her to go into the woods, and threatened to kill her if she ran. He then knocked her to the ground, went through her pockets before threatening to kill her if she did not perform oral sex. He then forced his penis into her vagina. After respondent left, she told her boyfriend that she had been raped, and the police were called. At the hospital, DNA was recovered, and later that DNA "matched" respondents' DNA. Doctor Arroyo learned that this case was not prosecuted further because the victim had died.

¶ 11 Doctor Arroyo also learned that there were four cases in which respondent was never charged, but his DNA "matched" that of the DNA recovered from the victim.

- In one instance, the victim reported that she was approached by two men, forced into an abandoned building and to remove her clothing. One of the men then vaginally penetrated her with his penis and the other man anally penetrated her with his penis. They both ejaculated. After they left, the victim dressed, contacted the police and DNA was recovered from the victim. The DNA "matched" the respondent's DNA. The victim admitted to the police that she had been drinking heavily, using drugs, and could not recall large parts of what happened.

- Also, in March of 1998, another case involved sexual assault with a handgun. DNA was recovered from the victim, which subsequently "matched" that of respondent, but the victim had died before that discovery was made.

- In 1999, in Georgia, the victim was walking to the store when she was pulled into an alley and forced to have sex against her will. She was taken to the hospital, where DNA was recovered, and it later "matched" respondent's DNA.

- Then, in 2005, there was a sexual assault "involving a handgun," and a vaginal swab produced a DNA profile that "matched" that of respondent. When the police attempted to locate the victim, they discovered that she had died.

¶ 12    When Doctor Arroyo asked respondent about these encounters during the interview, respondent denied that he committed any of the sexual assaults and stated, "it was a drug thing…he knew some of the women…it was consensual sex for drugs." The doctor determined that respondent "wasn't the most reliable historian" as his memory was not good and "didn't match up with the documentation."

¶ 13    Doctor Arroyo looked at respondent's disciplinary reports while he was incarcerated at IDOC and learned that respondent had minimal disciplinary history with one major infraction which resulted in segregation time. When respondent was housed in a secure IDHS facility, he also had minimal disciplinary history, including four "tickets" and two "warnings."

¶ 14    For his diagnosis, Doctor Arroyo consulted with the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). He determined that, within a reasonable degree of psychological certainty, that respondent had other specific paraphilic disorder, sexual arousal to nonconsenting persons, and antisocial personality disorder. He explained that "other specified" refers to a paraphilia section in the DSM-V which lists different paraphilias – in other words,

sexual disorder - and there is a diagnosis of "other specified paraphilic disorder" and "unspecific paraphilic disorder." If the individual's behavior does not fall into one of the eight categories in this section, the clinician will decide whether they want to specify what that other diagnosis is, or to not specify. He testified that the DSM-V states that this type of diagnosis is required in some cases. The criteria for "other specified paraphilic disorder, sexually aroused to nonconsenting persons" means a person has a sexual interest other than sexual interest in genital stimulation or preparatory fondling other than what is considered to be normal, physically mature, conception with human partner. The paraphilia becomes a disorder when engaging in that conduct causes the individual distress or impairment, or it causes harm or risk of harm to other people. In respondent's case, he had repeatedly engaged in behavior with nonconsenting people, and it has caused him stress and caused harmed to other people. Doctor Arroyo stated that this diagnosis is generally accepted in the area of clinical psychology, specifically, in the area of evaluation, diagnosis, and risk assessment of sexually violent persons.

¶ 15       Doctor Arroyo also diagnosed respondent with antisocial personality disorder. In making this diagnosis, he found that respondent had a pervasive pattern of disregard for or the violation of the rights of others since the age of 15. He found that respondent repeatedly engaged in behavior that could be grounds for arrest, such as thefts, batteries, and possession of drugs. He also found that respondent failed to plan and failed to anticipate the consequences of his misbehavior and future behavior by continuing to engage in similar illegal behavior that could have led to the same consequences. Looking at respondent's prior behavior, the doctor found that it showed that respondent had a lack of concern for other people and a lack of remorse. He found that respondent currently suffers from these mental disorders. While he testified that these disorders can increase

and decrease, depending upon the opportunity to reoffend, but "it's not something that you just expect to wake up one day and it's gone."

¶ 16    Doctor Arroyo explained the statutory definition of a "mental disorder" as "a congenital or acquired condition affecting the individual's emotional and volitional capacity and predisposes the individual to engage in an act of sexual violence." He testified that both diagnoses met this definition of a "mental disorder."

¶ 17    He also conducted a risk assessment, which measures the likelihood of a person to be charged or convicted of another sexual offense. He utilized the actuarial instruments of Static-99R and Static-2000R, and then looked at respondent's dynamic risk factors and protective risk factors. Because respondent was arrested for three of the offenses at the same time, he scored "one" in that category. Also, because respondent turned 60 years old two weeks before trial, he received a two-point reduction from his original score. Doctor Arroyo testified that respondent scored a three, which placed him in the average risk category.

¶ 18    The Static-2002R instrument looks at similar issues, but "it also tends to be little more conversative than the 99R…" He explained that, unlike the Static-99R, the Static-2002R will only look at charged offenses and sentencing dates "[s]o if you didn't have any prior sentencing dates before your last offense, then it counts as a zero." In respondent's case, the Static-2002R did not take into account seven of the prior sex offenses. The doctor testified that respondent scored a three, which placed him in the average risk category. He explained that, under both instruments, someone with that score is 1.39 times more likely to be recharged or reconvicted for another sexual offense compared to a typical sex offender who scored a two. In Doctor Arroyo's opinion, neither of these instruments accurately reflect respondent's entire risk to reoffend because neither

instrument took into account the uncharged offenses that were linked to respondent, and the Static-2002R did not account for one of the charged offenses because there was no sentencing date.

¶ 19     The doctor explained that, once he determined an individual's individual risk category, the developers of these instruments have indicated that the evaluator would need to decide whether this individual was a "routine offender" or "someone who was high risk and high needs." He determined that respondent was a "high risk and high needs" offender based upon respondent's criminal history where the uncharged offenses were not taken into account in the original testing instrument.

¶ 20     The doctor also looked at respondent's dynamic risk factors, described as factors that tend to increase a person's risk of engaging in intersexual behavior, and protective factors, described as decreasing a person's risk. He identified the following dynamic risk factors for respondent: (1) significant social influence; (2) capacity for relationship stability; (3) hostility towards women; (4) lack of concern for others; (5) impulsivity; (6) poor problem-solving; (7) deviant sexual preference; and (8) cooperations with supervision. The doctor also found that respondent did not have any protective factors, to decrease his risk, where he did not have any major medical issues and had not successfully completed a cognitive behavioral sex offender treatment program.

¶ 21     Doctor Arroyo's opinion, within a reasonable degree of psychological curtained, was that respondent met the criteria for an SVP. Respondent had previously been convicted of a sexually violent offense. Respondent had a mental disorder, including other specified paraphilic disorders, sexually aroused to nonconsenting persons, and antisocial personalities. Doctor Arroyo also determined that respondent was "dangerous" meaning that he was substantially probable to engage in active sexual violence. He based his opinion on his review of the records, his interview with respondent, the use of risk assessment tools, his education, training and experience. The doctor

composed a report with his findings, dated August 13, 2015. He also updated his report on February 14, 2019, and on January 11, 2021.

¶ 22     On cross-examination, Doctor Arroyo testified that there was a difference between the definition of a "mental disorder" in the SVP Act and the DSM-V, which is "basically the issue of risk." Under the DSM-V, there need not be a predisposition to engage in acts of sexual violence, whereas the SVP Act requires such a predisposition. He agreed that the DSM-V cautions that a diagnosis which included diminished control over one's behavior does not, in and of itself, demonstrate that a person is or was unable to control his or her behavior at a particular time.

¶ 23     Regarding the diagnosis of other specified paraphilic disorder, nonconsenting partners, Doctor Arroyo agreed that there have been attempts to include it as a "stand-alone diagnosis" in the DSM-V, but those proposals have been rejected. He also agreed that other clinicians may develop a different diagnosis, and some clinicians believe that this diagnosis is controversial.

¶ 24                                        Doctor Kimberly Weitl

¶ 25     Doctor Weitl testified that she is a licensed clinical psychologist, and she was declared an expert in the field of clinical psychology in evaluation, diagnosis, and risk assessment of sexually violent people. To assist her in her evaluation of respondent, she reviewed his records from IDOC, previous evaluations, police reports, court documents, and his criminal history. She also interviewed him in November of 2015. In her initial report, dated December 28, 2015, she determined that he met the criteria as a sexually violent person. She re-evaluated him in 2018, and again in 2020, and her opinion did not change in 2018 or 2020. She wrote updated reports each time she conducted her re-evaluation. Since that time, she also reviewed the most recent records from the treatment and detention facility, as well as other evaluations that were completed by other doctors within that time. Her opinion had not changed during that time.

¶ 26    She explained that during her evaluations, she reviewed respondent's criminal history. She considered cases in which respondent was never charged or convicted because she is looking at patterns of behavior, but she would not give those offenses as much weight as cases for which he was convicted. She testified that it is generally accepted to consider these types of cases when evaluating risk because it has been found that individuals who have been found not guilty or not charged of an offense are still at a higher risk than someone who has been accused less times. In addition to the details provided by Doctor Arroyo, during Doctor Weitl's testimony, she also went through the offenses for which respondent was charged or convicted in chronological order. She testified that respondent was arrested in 2006, and his DNA "matched" the offender in nine cases. When she considered all these cases, she noticed that there were similarities in which he would grab a woman he did not know, take her to an isolated location, and use threats and weapons, including knives, a gun or a brick. He also had a pattern of orally and/or vaginally raping women and forcing them to perform oral sex.

¶ 27    She also considered his disciplinary history while he was incarcerated, whether his behavior changed once he was in a controlled environment and how it affected his decision-making process. She described his adjustment as "good to fair." She considered respondent's failure to participate in sex offender or substance abuse treatment, but his violations while incarcerated were minimal, except for one serious violation, which resulted in being placed in segregation. She also considered his behavior while being detained at an IDHS Treatment and Detention Facility starting in 2015. She stated that his adjustment had not gone as well because he received "moderate to serious violations" there. She noted that he had used vulgar language with the staff, disobeyed staff orders, and stole food. Looking at this behavior, she determined that there is still evidence of antisocial behavior.

¶ 28    Utilizing the DSM-V, she diagnosed him with sexual sadism. She described sexual sadism as a group of sexual disorders, called paraphilic disorders, which involve a person who derives sexual pleasure while inflicting pain or humiliation on the nonconsenting person. In making this diagnosis, she found that respondent used violence against the victim above and beyond what was needed to control the victim and to have sexual intercourse with her. She considered that he punched one of the victims during the sexual assault and derived sexual pleasure from it. There were also instances of humiliation, anal rape, and raping with the barrel of a gun. She found that respondent was able to ejaculate even while the victim was clearly suffering in these instances. She contrasted someone having sadistic sexual interest, which involves consenting partners, with the diagnosis of sexual sadism, involving nonconsenting adults. She explained that sexual sadism cannot be resolved or go away; it's a lifelong sexual interest, although it may diminish somewhat in frequency or intensity.

¶ 29    Utilizing the DSM-V, she also diagnosed him with antisocial personality disorder. She found that he was a person who did not follow the social morays, broke the law, was deceitful and was unconcerned about other people's feelings. In making this diagnosis, she also considered that he had committed nonsexual offenses, including burglary, neglect of an elderly person, possession of a controlled substance, and driving under the influence with a child in the car. She explained that this type of antisocial personality disorder does not resolve or go away on its own, but it may diminish somewhat. Respondent developed this personality disorder "over the years" and was how he "copes with the world." She determined that these two disorders met the criteria for the disorders under the SVP Act as a congenital or acquired disorder that effect his emotional or volitional capacity, and these disorders predispose him to engage him in acts of sexual violence.

¶ 30    In doing her risk assessment, she utilized the Static-99R and Static-2002R actuarial instruments to determine whether he is substantially probable to commit another sex offense. For the Static-99R instrument, respondent scored a seven, but then he went down three points to a score of four when he turned 60 years old. While respondent was identified in nine cases, she could only count one of these cases because he had not been caught in between committing each of them. A person with a score of four means that he is above average risk, or nearly two times as risky as the typical sex offender. Most sex offenders who have been convicted or charged with a sex offense had a score of two. With the Static-2002R test, he scored either a three or four. She testified that she had some difficulty with this test because of his age and criminal history. The test looked at prior sentencing dates but, because respondent was not arrested for these offenses until 2006, his score was seven, but was reduced upon turning 60 years old. He fell into the average or above average risk category. Doctor Weitl explained that these instruments are considered conservative, meaning that they underestimated his true risk, because they only count offenses where the person has been caught, and it is known that in these types of cases, offenders are not caught very often.

¶ 31    In her opinion, these scores did not accurately reflect his individual risk and his score should not have decreased his risk so much because he was still healthy at his age. She also thought that this score did not accurately reflect his sex-offending history. In her own dynamic factor risk assessment, which are factors external to the actuarial instruments, she considered other factors that research has identified and increased her assessment of his risk to reoffend. This included deviant sexual interest, his pattern of violent sexual offending, along with his antisocial personality disorder. She determined that she had an antisocial lifestyle, including a parole violation, a history of intimacy deficits in that he fathered multiple children with different women, and he acknowledged using prostitutes and drug addicts to get sex.

¶ 32    Regarding his protective factors which would mitigate or decrease his risk to reoffend, she considered that he had repeatedly refused sex offender treatment, and that he made statements that he did not see a purpose with treatment. He also considered that he did not have any health issues. These factors did not mitigate, or decease, his risk to reoffend.

¶ 33    After completing her risk assessment, she determined that he was substantially probable to commit another violent sex offense if not in a secure facility. He had been convicted of a sexually violent offense, currently suffers from a qualifying mental disorder, and he is dangerous because he has a mental disorder that makes him substantially probable, or much more likely than not, to commit another act of sexual violence. In her opinion, respondent met the criteria to be civilly committed as a sexually violent person.

¶ 34    On cross-examination, she testified that the DSM-V states that advancing age is likely to have a "reducing effect" on sexual sadism disorder and that a disorder can reduce to the extent that someone does not act on it. She also testified that the DSM-V states that antisocial personality disorder may become less evident or remit as the person ages, but also explained that "remit" did not mean that the disorder would go away completely. She also testified that it is "generally accepted" that the Static-99R and Static-2002R actuarial instruments are "conservative measures" because they only count offenses where people have been caught. She explained that these instruments do not work when an individual is arrested after committing several sex offenses, as opposed to getting arrested after committing each offense.

¶ 35                                Doctor Luis Rosell

¶ 36    Respondent presented the testimony of Doctor Rosell, who was qualified as an expert in the field of evaluation, diagnosis, and assessment of risk for sex offenders. In this case, he was first

contacted by the defense in 2016 to conduct an evaluation of respondent and to determine whether respondent met the criteria as a sexually violent person.

¶ 37    As part of his review, he interviewed respondent in 2016. He also reviewed the evaluations conducted by the other doctors along with respondent's file, he interviewed respondent in 2016., he looked at respondent's criminal history, his family history, education, his behavior while incarcerated, along with respondent's version of events. He wrote a report in 2016, and again in 2020. He interviewed respondent virtually, as opposed to in-person, in 2020. Since writing the second report, he reviewed additional records from IDHS before testifying at trial.

¶ 38    At the time of trial, he opined that respondent did not have a mental disorder as defined by the SVP Act, and he was not substantially probable to reoffend.  He acknowledged that he previously diagnosed respondent with antisocial personality disorder and found him to have a mental disorder as defined by the SVP Act. In making his latest determination, he focused on respondent's current level of functioning, as opposed to focusing on his past. He explained that he changed his opinion because respondent has been able to demonstrate an ability to control his behavior in a controlled environment. Regarding the impact of respondent's criminal history on his determination, Doctor Rosell testified that he did not assume that respondent had engaged in the behavior and would also look at why the case was not adjudicated. Regarding respondent's disciplinary history while incarcerated, Doctor Rosell focused on the lack of any discipline for sexual misconduct and his conclusion that respondent could engage with female prison staff without any problems.

¶ 39    He diagnosed respondent with antisocial personality disorder, which he testified was "fairly common" for incarcerated persons but determined that it did not constitute a mental disorder because respondent demonstrated that he could "follow rules" with only a few exceptions, and that

he had been abiding the rules relative to how he had previously acted. He focused more on respondent's current behavior as opposed to his past behavior.

¶ 40 As to Doctor Arroyo's diagnosis of other specified paraphilic disorder, Doctor Rosell testified that there are no criteria for this disorder in the DSM-V, and, in his opinion, it is not appropriate to use this diagnosis. For Doctor Weitl's diagnosis of sexual sadism, he did not think that there was enough evidence that his primary or sole interest is sexual arousal for the humiliation, pain and suffering of another. He testified that a sexual sadist would engage in other types of behavior, which he found were not present in this case, including kidnapping a person, ritual conducts with that person, and keeping trophies. He disagreed with Doctor Weitl and concluded that when a type of conduct remits, it means that the conduct no longer is exhibited as in was in the past.

¶ 41 Even though he did not find that respondent had a mental disorder, he did a risk assessment. He determined that respondent scored 4 in the Static-99R and scored 7, reduced to 5 because respondent turned 60, in the Static-2002R. In doing his risk assessment in 2016, he originally determined that respondent was substantially probable to reoffend, but his opinion changed based upon new research, respondent's age of 60 years, and he engaged in positive behavior during confinement. In his opinion, respondent did not meet the criteria to be a sexually violent person.

¶ 42 After the conclusion of the testimony, the jury found respondent to be a sexually violent person. At the sentencing hearing, the trial court agreed with Doctor Weitl's post-trial predisposition investigation that the least restrictive environment for respondent to be safely and effectively managed and treated would be in a residential sex offender treatment program at IDHS.

¶ 43                                                      ANALYSIS

¶ 44 On appeal, respondent argues that: (1) the evidence was insufficient to prove beyond a reasonable doubt that he was a sexually violent person, (2) the State made improper comments

during opening statements and closing and rebuttal arguments, and (3) the trial court erred in declining to include a non-pattern jury instruction regarding the basis of opinion testimony for expert witnesses. We address each argument in turn.

¶ 45    The Sexually Violent Persons Commitment Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2016). The Act defines a "sexually violent person" as an individual who has "been convicted of a sexually violent offense" and who "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2016). Both the State and respondent have the right to retain an expert, and a court-appointed expert will be provided for indigent individuals. 725 ILCS 207/25(e) (West 2016). If the State proves beyond a reasonable doubt that an individual is a sexually violent person, that individual may be indefinitely committed "until such times as the person is no longer a sexually violent person." 725 ILCS 207/35(f), 40(a) (West 2016). If the State does not meet this burden, its petition must be dismissed. 725 ILCS 207/35(f) (West 2016).

¶ 46                                    **I. Sufficiency of the Evidence**

¶ 47    Respondent claims the State failed to prove beyond a reasonable doubt that he is a sexually violent person under the SVP Act. The State argues that the testimony of the two experts was sufficient to prove beyond a reasonable doubt that respondent is a sexually violent person. "When reviewing a challenge to the sufficiency of the evidence, we consider whether, 'viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt.'" *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶ 68 (quoting *In re Commitment of Fields*, 2014 IL 115542, ¶ 20). We will not review a determination

that a person is a sexually dangerous person "unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt." *Id.* (quoting *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. Also, we will not substitute our judgment for that of the trier of fact on the credibility of witnesses or the weight to be given to the evidence. *Id.*

¶ 48     "To establish that a respondent is an SVP, the State must prove beyond a reasonable doubt that the respondent; (1) was convicted of a sexually violent offense; (2) has a mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence." *In re Commitment of Conley*, 2023 IL App (1st) 211084, ¶ 46 (citing *In re Commitment of Fields*, 2014 IL 115542, ¶ 20). "When reviewing claims challenging the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *Id.*

¶ 49      Here, respondent does not dispute that he was convicted of a sexually violent offense. Instead, he focuses his claims on whether the State proved that respondent has a mental disorder and, whether this mental disorder makes it substantially probable that he will engage in acts of sexual violence.

¶ 50                                    **A. Existence of Mental Disorder**

¶ 51     The respondent first argues that the State failed to prove beyond a reasonable doubt that he suffers from a mental disorder as defined under the SVP Act. Referencing various isolated portions of Doctor Arroyo's and Doctor Weitl's testimonies, he argues that these experts stated their conclusion that respondent had a mental disorder, but did not explain how they reached this conclusion. The State, in turn, responds that the evidence proved that defendant suffered from a qualifying mental disorder, and the experts' opinion was based upon their professional judgment and expertise after reviewing extensive documentation.

¶ 52          A "mental disorder" is defined under the Act as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). In determining whether the State has established the existence of a mental disorder under the SVP Act, our appellate courts have routinely relied on expert testimony and deferred to the factfinder's determinations regarding an expert's credibility. See, *e.g.*, *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 48.

¶ 53          Here, the State presented testimony from two experts that respondent has a mental disorder as defined by the SVP Act. Doctor Arroyo diagnosed him with other specific paraphilic disorder, sexual arousal to nonconsenting persons, and antisocial personality disorder. Doctor Weitl diagnosed him with sexual sadism and antisocial personality disorder. Contrary to respondent's contention that these experts did not explain the reasons for their opinions, both explained that they utilized the DSM-V to make their diagnosis. Both pointed to their review of documents relating to respondent's extensive history of sex offenses and non-sexual offenses, medical information, disciplinary records from IDOC, and their own interviews with respondent. Both doctors explained that, in considering respondent's criminal history, they were looking for patterns or similarities showing that this behavior was attributable to a mental disorder. For instance, Doctor Weitl explained, in part, that she noticed that there were similarities in respondent's behavior in that he would grab a women he did not know, take her to an isolated location, use threats or weapons, orally and/or vaginally rape the women and force them to perform oral sex.

¶ 54          Both doctors considered the results of their individual interviews with respondent. For instance, Doctor Arroyo looked to see if there was any consistency in respondent's explanation for these offenses, and noted that respondent denied committing any of the sexual assaults, denied knowing anything about some of the cases, and in other cases, he stated that he engaged in

consensual sex with the women "for drugs." He found that defendant's version of events "didn't match up with the documentation." Both doctors reviewed respondent's disciplinary records while incarcerated with Doctor Arroyo finding that respondent had "a minimal disciplinary history[,] while Doctor Weitl described respondent's adjustment to a controlled environment at IDOC as "good to fair" and his incarceration at the IDHS facility since 2015 as "not was well as in [I]DOC."

¶ 55    Doctor Arroyo explained the criteria for both diagnoses and then explained how respondent met that criterion. Likewise, Doctor Weitl explained the criteria for both of her diagnoses and then explained how respondent met that criterion.    More importantly, each expert opined that respondent's mental disorders were attributable to either a congenital or acquired condition. Even respondent's expert acknowledged that he previously diagnosed him with antisocial personality disorder, although he determined that respondent did not suffer from this condition during subsequent review in 2018 and 2020.

¶ 56     Taking the expert testimony in the light most favorable to the State, we conclude that a rational trier of fact could find beyond a reasonable doubt that respondent suffers from either a congenital or acquired condition affecting his emotional or volitional capacity that predisposes him to engage in acts of sexual violence. In doing so, we are guided by cases in which this claim has previously been addressed by other courts in Illinois. See *People v. Holt*, 2022 IL App (1st) 210402, ¶¶ 74-75 (finding that the experts adequately explained their opinions); *People v. Montilla*, 2022 IL App (1st) 200913, ¶ 114 (same); *People v. Evans*, 2021 IL App (1st) 192293, ¶ 48 (same); *People v. Moody*, 2020 IL App (1st) 190565, ¶¶ 49-50 (same).

¶ 57    In support of his argument that the experts who testified for the State failed to explain how they reached their conclusion that respondent suffers from a mental disorder as defined under the SVP Act, respondent relies on the plurality decision of our supreme court in *People v. Murray*,

2019 IL 123289. The defendant in *Murray* was convicted of the unlawful possession of a firearm by a street gang member, and, on appeal, challenged the opinion of the State's expert that the Latin Kings were a street gang. *Id.* ¶¶ 1, 17. For that offense, the State was required to prove that he was part of a street gang by establishing, in part, that the defendant committed two or more gang-related criminal offenses committed within a specific timeframe. On appeal, the defendant argued that the expert had failed to explain the basis for this conclusion. *Id.* ¶ 34. The supreme court reversed the defendant's conviction, holding the expert's testimony was insufficient because Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) "unambiguously requires that [an expert] articulate the reasons for his opinion." *Id.* ¶ 31. "While an expert is not obligated to bring forth the underlying facts and data on which his or her opinion was premised, just identifying the source of those facts and data without explaining the reasons for the opinion fails to prove the elements of an offense beyond a reasonable doubt." *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 46 (citing *Murray*, 2019 IL 123289, ¶ 31).

¶ 58        In agreeing with the defendant's argument, the court looked at the State's concession that its expert had not disclosed the specific crime evidence that served as the basis for his opinion and rejected its attempt to shift the burden of proof on that issue to the defendant by arguing that his counsel could have drawn the necessary information out on cross-examination. *Id.* ¶¶ 29-30.

¶ 59        Here, unlike in *Murray*, we find that both experts testified as to the type of information underlying their opinions and made the connection between that information and their opinion that respondent met the requirement for being a sexually violent person under the SVP Act. *People v. Evans*, 2021 IL App (1st) 192293, ¶ 50 (distinguishing *Murray* on that basis); *People v. Moody*, 2020 IL App (1st) 190565, ¶ 53 (same). Moreover, as another division of this court already recognized, "[t]he statutory requirements at issue in *Murray* are far different from those in the

[SVP] Act." *Holt*, 2022 IL App (1st) 210402, ¶ 74. Therefore, respondent's reliance on *Murray* does not persuade us to find that the evidence was insufficient.

¶ 60     Therefore, we conclude that the evidence at trial established that respondent had a mental disorder where the two State experts properly stated their conclusion that respondent had a mental disorder, explained how they reached this conclusion, and made the proper connected the underlying information and their opinion.

¶ 61                    **B. Existence of Substantial Probability to Reoffend**

¶ 62     Respondent argues that the State failed to prove that he was dangerous because a mental disorder makes him substantially probable to engage in acts of sexual violence. We disagree. Both Doctor Arroyo and Doctor Weitl testified that respondent's disorders are congenital or acquired conditions and affect his emotional or volitional capacity. The experts used several recognized assessments to predict respondent's likelihood of reoffending in making their determinations, explained how these assessments impacted their decision, and ultimately concluded that the evidence established that respondent was substantially probable to engage in acts of sexual violence.

¶ 63     Both experts utilized the Static-99R and Static-2002-R actuarial instruments. Doctor Arroyo explained that he utilized both instruments because the authors indicated that one would get a better idea of a person's true risk by doing so, and that a person's risk falls somewhere between them. He also explained that these instruments tend to underestimate of person's risk because, for respondent, the uncharged offenses were not considered in either test, and the Static-99R did not consider all of respondent's convictions because there was no separate sentencing date for these offenses. Instead of scoring the three offenses separately, "it counts as 1." Respondent also received a two-point reduction because he turned 60 years old two weeks before trial. Ultimately,

respondent scored a three in both actuarial instruments, which put him in the average risk category. He explained that this score meant that a person is 1.39 times more likely to be recharged or reconvicted for another sexual offense compared to the typical sex offender who scored two.

¶ 64    He also looked at the dynamic risk factors, factors that research has found to tend to increase a person's risk of engaging in another sexual offense, and the protective risk factors, which are factors which tend to decrease that risk. Doctor Arroyo identified the following dynamic risk factors: (1) significant social influence; (2) capacity for relationship instability; (3) hostility towards women; (4) lack of concern for others; (5) impulsivity; (6) poor problem-solving; (7) deviant sexual preference; and (8) cooperation with supervision. For the protective risk factors, Doctor Arroyo noted that respondent's age had already been considered, he had no major medical issues that would prevent him from re-offending, and he had not successfully completed a cognitive behavioral sex offender treatment program. Ultimately, he concluded that respondent was substantially probable to engage in acts of sexual violence.

¶ 65    Doctor Weitl utilized the same instruments in assessing risk and found that respondent originally scored seven in the Static-99R instrument, but his score was lowered to four points after he recently turned 60 years old. She also considered that this test only considered that he had been identified in one case, as opposed to the nine cases for which he was identified, because he was not arrested in between each of these offenses. She also determined that respondent was above average risk to reoffend with the score of four. She explained that he was twice as risky as the typical sex offender with this score. With the Static-2002R, she found that he originally scored seven but after he turned 60, his score was either three or four. She agreed with Doctor Arroyo's assessment that both instruments underestimate a person's risk to reoffend.

¶ 66 In conducting her own risk assessment, Doctor Weitl considered that respondent had several dynamic factors, which research has found to increase a person's risk to reoffend, including respondent's deviant sexual interest, his pattern of violent sexual offender, an antisocial lifestyle, fathering multiple children with different mothers, and having sex with prostitutes and drug addicts. For the protective risk factors, she looked at respondent's repeated refusal to receive treatment and his lack of significant health problems.

¶ 67 Based on their interviews with respondent, his history of sexual violence, and the results of the risk assessments, both experts opined that respondent's emotional or volitional capacity predisposed him to commit acts of sexual violence. They concluded that a substantial probability existed that respondent would commit another sexually violent crime in the future. Viewing the evidence in the light most favorable to the State, a reasonable trier of fact could find beyond a reasonable doubt that respondent is substantially probable to commit future acts of sexual violence.

¶ 68 Respondent relies upon a factual comparison of the instant case with *In re Commitment of McCormack*, 2021 Ill App (1st) 181930-U, an unpublished case in which a panel of this court reviewed the trial court's determination that the respondent was substantially likely to reoffend.[1] In *McCormack*, 2021 IL App (1st) 181930-U, the trial court, as the trier of fact, stated that it relied upon factors outside the actuarial assessments in making this determination and announced what factors that it considered. *Id.* ¶¶ 22-23. On appeal, this court found that the evidence presented at the trial did not support the trial court's reliance upon these specific factors. *Id*. ¶¶ 30-43. Here, respondent was tried before a jury. Consequently, the record does not show which factors - including the actuarial assessments, the experts' testimony relating to how these assessments

---

[1] Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes.").

underestimated respondent's risk, the presence of dynamic risk factors, or the absence of protective factors - the jury relied on in finding that respondent was substantially likely to sexually reoffend. The respondent's argument in this case merely constitutes an attempt to have this court reassess the experts' credibility, reweigh the evidence, and substitute its judgment for that of the jury, which we may not, as it well-established that it is "not the function of this court to retry the [respondent]." *In re Commitment of Montilla*, 2022 IL App (1st) 200913, ¶¶ 117-121.

¶ 69    We also note that the Act does not require a particular actuarial score for a factfinder to find beyond a reasonable doubt that a person is substantially probable to sexually reoffend. *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 70; *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 76; *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶¶ 46-48. "It is the province of the jury to evaluate the results of any testing along with the other evidence presented to determine whether he was 'substantially probable' to reoffend." *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 25 (citing *In re Tittlebach*, 324 Ill.App.3d 6, 11 (2d Dist. 2011); *In re Detention of Welsh*, 393 Ill.App.3d 431, 455-56 (2d Dist. 2009); *People v. Smith*, 177 Ill.2d 53, 73 (1997). Therefore, we reject his argument that the State failed to prove that he was dangerous because a mental disorder makes him substantially probable to engage in acts of sexual violence, and we affirm the decision to find that respondent is a sexually violent person.

¶ 70              **II. Propriety of the State's Opening Statements and Closing Arguments**

¶ 71    We next address respondent's claim that the State compromised his right to a fair trial by making several improper comments during opening statements and closing arguments. Specifically, respondent points to the State's comments regarding the basis of opinion testimony and argues that the State improperly argued this testimony as substantive evidence. In turn, the State argues that the trial court exercised appropriate discretion over the scope of opening

statements and closing arguments where the State's comments about opinion testimony did not deprive respondent of a fair trial. We find that the trial court did not abuse its discretion, and there was no error in the presentation of opening statements and closing arguments.

¶ 72     The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. *In re Commitment of Moore*, 2023 IL App (5th) 170453, ¶ 60 (citing *People v. Leger*, 149 Ill.2d 355, 392 (1992)). Moreover, it is well-established that the State has wide latitude in making opening statements and is entitled to comment on the evidence; however, comments intending only to arouse the prejudice and passion are improper. *Id*. ¶ 60 (citing *People v. Harris*, 2017 IL App (1st) 140777, ¶ 59 Generally, improper remarks by the prosecutor in opening statements do not constitute reversible error unless they result in substantial prejudice to the respondent. See *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 24.

¶ 73     Moreover, "it is well-established that a prosecutor is allowed wide latitude in closing argument [citations] and it is entirely proper for the prosecutor, during closing argument, to comment on the evidence offered at trial and to draw legitimate inferences from the evidence, even if those inferences are detrimental to the defendant." *People v. Desantiago*, 365 Ill.App3d 855, 866 (1st Dist. 2006). Moreover, the State is permitted to remark upon matters of common knowledge and experience during closing arguments. *People v. Runge*, 234 Ill.2d 68, 146 (2009). "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context." (Internal quotation marks omitted.); *People v. Caffey*, 205 Ill.2d 52, 104 (2001). "'[A]bsent a clear abuse of discretion resulting in manifest prejudice to the defendant[,]'" we will not interfere with the trial court's determination of the propriety of the prosecution's

closing argument. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 49 (quoting *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102).

¶ 74    We recognize that there is currently a split in the appellate court regarding which standard of review should apply to issues regarding prosecutorial misconduct in closing argument. This split stems from two statements made by the Illinois Supreme Court in *People v. Wheeler*, 226 Ill.2d 92, 121 (2007), which suggested that the *de novo* standard applies, and *People v. Blue*, 189 Ill.2d 99, 128 (2000), which suggested that the abuse of discretion standard applies. In *Phagan*, this district found that the abuse of discretion standard is the proper standard, as "the trial judge is present for the entire trial, * * * has the benefit of 'hearing the remarks of counsel on both sides" and is better suited to determine whether anything that happened or was said justifies the challenged remark." *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 48-50 (quoting *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 502 (1892)); See also *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 128. In making this determination, we noted that "the pedigree for an abuse of discretion standard spans more than a hundred years." *Id.* at ¶ 49 (citing *People v. McCann*, 247 Ill.App.3d 130, 170-71 (1910); and *Bulliner v. People*, 95 Ill. 394, 405-06 (1880)). We need not resolve the question of the extent to which each of these standards apply in this case. In our view, these comments do not necessitate a new trial under either standard.

¶ 75    Relying upon *Gavin*, 2014 IL App (1st) 122918, respondent contends that he was prejudiced by the prosecutor's opening statement and closing arguments where the prosecutor substantively argued the underlying facts of respondent's criminal convictions. Pointing to *In re Commitment of Butler*, 2013 IL App (1st) 113606, and *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, the State argues that the prosecutor's comments were proper where they focused on the underlying facts and circumstances of a respondent's criminal history which the two State expert witnesses

relied upon, in part, in supporting their opinion. We find that the facts here more closely align to those found in *Butler* and *Tenorio* than *Gavin*, and therefore, conclude that the trial court did not abuse its discretion.

¶ 76     "It is well-settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied on by experts in the particular field." *Tenorio*, 2020 IL App (1st) 182608, ¶ 43 (citing *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51). Moreover, although the expert is permitted to testify as to the underlying facts or data, they are admitted for the limited purpose of explaining the basis for the expert's opinion, and "the basis of an expert's opinion must not be presented to the jury as substantive evidence of the underlying assumptions." *Id.* ¶ 44 (citing *Butler*, 2013 IL App (1st) 113606, ¶ 31).

¶ 77     In *Butler*, we viewed the prosecutors' comments in their entirety and found that "the State argued the facts and circumstances of respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of their expert witnesses." *Butler*, 2013 IL App (1st) 113606, ¶ 34. Likewise, in *Tenorio*, we found that the prosecutor's comments were proper where "the State focused on the fact that the experts had relied on the existence of a pattern of behavior and recited the details of respondent's prior offense in the context of describing that pattern." *Tenorio*, 2020 IL App (1st) 182608, ¶ 48.

¶ 78     However, in *Gavin*, the prosecutor recounted the respondent's criminal history in detail during opening statements, closing argument and rebuttal argument. We found that "the State repeatedly referred to the underlying facts as something other than the basis for the experts' opinions." *Id.* ¶ 73. For instance, the prosecutor argued that the experts were going to "tell" or "show" the jury about the respondent's past sex crimes, referred to the hearsay evidence as "facts"

and "evidence[,]" and "argued the explicit facts underlying 'the respondent's convictions as a narrative" and did not explain to the jury how the experts relied on these facts to diagnose or assess the respondent. *Id.* ¶¶ 73-74. As such, the narration misdirected the case's focus by disconnecting the underlying facts and the experts' use of them, thereby leading the jury to consider the facts independent of the experts' testimony. *Id.* ¶ 74.

¶ 79    As to the prosecutor's remarks during opening statements in this case, we find that they are more like those in *Butler* and *Trenorio* than *Gavin*. In opening statements, the State explained that "Doctor Arroyo and Doctor Weitl both diagnosed the respondent after seeing a pattern of behavior from his records, from the court, the police, prison, and interviews." Thereafter, the State referenced respondent's criminal history as his "pattern of behavior." When respondent objected, the trial court overruled the objection, but cautioned the jury that "[o]pening statements are not evidence, merely what the attorneys believe they will show." Then, the State explained that they were offering this information to explain "his behavior to support the doctors' diagnosis" and "the doctors relied on this pattern of behavior and diagnosed the respondent with a mental disorder as required under the Act." Thus, the State focused on the fact that the experts had relied on the existence of a pattern of behavior and recited the details of respondent's prior offense in the context of describing that pattern.

¶ 80    Respondent also argues that he was further prejudiced when the trial court denied his motion *in limine*, which sought to bar the State from disclosing the expert witnesses' bases of their opinion in opening statements. However, we find that respondent has forfeited this claim by presenting it in a cursory fashion and without citation to relevant authority, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) (the appellant's brief shall state the appellant's contentions "and the reasons therefore, with citation of the authorities.") A reviewing court is not a repository

into which an appellant may dump the burden of argument and research, and the failure to clearly define issues and support them with authority results in forfeiture of the argument. *In re Detention of Lieberman*, 379 Ill.App.3d 585, 610 (1st Dist. 2007).

¶ 81        As to the State's comments during closing argument, respondent argues that the State used the details of respondent's criminal history as actions taken by him rather than as the contents of documents relied upon by the expert witnesses. However, before discussing this information, the State prefaced its remarks by informing the jury that Doctor Arroyo and Weitl based their opinion on "the ample evidence of mental disorder which was over 10 years of sexual offending in the community….[a]nd they saw a pattern of behavior that's supported these diagnos[e]s. Let's talk about that pattern." After respondent objected, the trial court instructed the jury that they should rely upon their own recall of the evidence." The State then emphasized to the jury that it was going over this information to "explain why the Doctor thinks he has the pattern of behavior for their diagnosis and for the risk assessment." Thus, during closing arguments the State sufficiently tied the underlying facts to the testimony that respondent had a mental disorder.

¶ 82        Furthermore, to the extent that there was any error, the trial court cautioned the jury that this evidence was introduced for a limited purpose and may not be considered by them as evidence. An error resulting from a prosecutor's remarks is usually cured when the circuit court sustains an objection or admonishes the jury. *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 24. Here, before each expert testified and after closing arguments, the circuit court instructed the jury in advance with a modified version of IPI 2.04, stating that the bases of the experts' testimony were not evidence and could only be used to evaluate their opinions. The jury was also instructed more than once that the statements of attorneys in opening statements and closing argument are not evidence and that it should disregard any such statement that was not based on the evidence. See Illinois

Pattern Jury Instruction Criminal No. 1.03 (approved July 18, 2014); *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 38. It is well settled that jury instructions "carry more weight than the arguments of counsel." *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. For that reason, we have recognized that "[a] trial court's instructions that closing arguments are not evidence protect [a] defendant against any prejudice caused by improper comments made during closing arguments." *Id.* "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. Unlike in *Gavin*, where we found that the prosecutors presented their argument during rebuttal in such a pervasive and inflammatory manner, engaging in the use of sarcasm and mockery, here, there is not enough to rebut this presumption.

¶ 83        Moreover, in rebuttal argument, the State's comments were in direct response to remarks made by respondent's counsel. *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42 (prosecution may respond in rebuttal argument to statements made by the defense counsel that clearly invite a response). In *Kelley*, respondent's counsel contended in closing argument that respondent did not sexually offend against women or inmates while he was in custody or detained. However, this court found that the State's response in rebuttal was proper where "the State did not argue respondent's past crimes as substantive evidence but, instead, argued reasons why the jury should credit the testimony of its expert witnesses in response to defense counsel's attacks on the basis of their opinions." *Id.* ¶ 45.

¶ 84        In closing argument, respondent's counsel argued at length that there was no current evidence that respondent suffered from any mental disorder where he had not acted out on this behavior while incarcerated. In particular, counsel argued that, "…if [respondent] has urges to commit sexually violent offenses like the two doctors said he does, where is the evidence of him acting out

on it. I didn't hear any." He further argued, "[w]hat testimony did you hear that [respondent] is displaying symptoms of OSPD nonconsent? Is he acting out at the facility where he is housed. Nope. Sure isn't…" Building upon this argument, respondent's counsel also argued, "…He can't act out because, no, there is cameras, and there is [sic] people watching and it's not like he is out on the streets. Yes, those things are true but they don't prevent someone from acting out if they have such a terrible mental disorder that makes them predisposed to commit acts of sexual violence.."

¶ 85    In response, the State argued that Dr. Weitl testified that this type of antisocial personality disorder does not resolve or go away on its own, but it may diminish somewhat with age. In support of this argument, the State pointed out that "Now, I want you to keep in mind how long he offended before he got caught. '93 to 2007. Okay. That's 14 years engaging in a very specific, very violent pattern of behavior. That doesn't go away overnight…" In response to respondent's behavior while incarcerated, the State argued, "…[h]e is not stupid. All right. He knows he wouldn't get away with it. And we know that he wouldn't get away with it because we have seen him tweak his pattern of behavior so that he could get away with this more often and the tweaks he made [were] very effective because he wasn't caught for 14 years." The State went on to utilize the facts of these prior offenses to explain how respondent had "tweaked" his behavior so he would not get caught.

¶ 86    Lastly, respondent's counsel argued that Doctor Arroyo and Doctor Weitl were not credible because "they really hung their hat on the fact that there were these DNA association" but the doctors also admitted that the DNA evidence "could not prove where there was consensual or nonconsensual interaction." At that point, counsel pointed out that respondent had told both doctors that he had consensual sex with the victims in exchange for crack cocaine to explain why his DNA was found in the rape kits. In response, the State argued that respondent was "just the

unluckiest man in the world right now…" to be falsely accused nine times in different states. The State went on to point out that respondent's account could not be believed because"[a]lmost all of his victims say there was a weapon…Guns, knives, ties one up with rubber tubing. That's not consent. His story is not true. All right. Doesn't make sense. He committed those rapes. There is evidence of that." At that point, the trial court sustained the defense objection. The State then ameliorated this comment by emphasizing to that jury that this case is "about his pattern of behavior. Whether this pattern of behavior suggests or whether this mental disorder suggest that he is dangerous enough and substantially probable to commit another act of sexual violence…"

¶ 87　　Thus, these comments were directed in response to respondent counsel's attacks on the bases of Doctor Arroyo and Doctor Weitl's opinion testimony, and it was not directed towards arguing his criminal history as substantive evidence. Any improper comments were cured when the trial court properly sustained respondent's objection and instructed the jury disregard any such comments. *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 42.

¶ 88　　Even if we were to find that there was error in the inclusion of these comments, respondent cannot establish that they resulted in substantial prejudice to him. This standard is met if it is impossible to discern whether the verdict was based on the evidence or the improper remarks. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 69. In assessing the prejudicial impact of challenged remarks, we must consider them in the context of the closing argument as a whole. *Id.* ¶ 69. As previously outlined, the evidence against respondent was overwhelming as to finding him to be a sexually violent person. Thus, based upon the evidence presented in the entire record, even if any error occurred, we cannot say that these comments were of such magnitude that they resulted in substantial prejudice to respondent and constituted a material factor in his conviction.

¶ 89　　**III. Trial Court Declined to Include Non-IPI Jury Instruction**

¶ 90        Respondent argues that the trial court erred in refusing to instruct the jury as to a non-IPI jury instruction where the patterned jury instruction does not accurately state the law regarding the consideration of basis of opinion testimony by expert witnesses. Specifically, he argues that "the state of Illinois prohibits a factfinder from considering the facts or data upon which an expert witness relies for their truth[,]" but IPI 2.04 "does not contain this explicit prohibition." He argues that, instead, this instruction "only commands jurors not to consider basis of opinion testimony as evidence…" In turn, the State contends that the trial court did not abuse its discretion in declining to provide a non-IPI jury instruction where there was an applicable pattern jury instruction which accurately reflected the law, this instruction is presumed to be correct, and "the fact that it does not specifically prohibit the jury from considering basis of opinion testimony for its truth does not mean it inaccurately states the law." We agree with the State and decline to find that IPI 2.04 inaccurately states the law regarding the jury's consideration of basis of opinion testimony for expert witnesses.

¶ 91        Jury instructions are intended to convey to the jury the correct principles of law applicable to the evidence submitted so that the jury can "'arrive at a correct conclusion according to the law and the evidence.'" *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40 (quoting *People v. Pinkney*, 322 Ill.App.3d 707, 717 (1st Dist. 2000)). In addressing the adequacy of the jury instructions, the reviewing court must consider the jury instructions in their entirety to determine whether they fully and fairly cover the law. *People v. Hoffman*, 2012 IL App (2d) 110462, ¶ 8.

¶ 92        Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) specifically provides that when an Illinois Pattern Jury Instruction applies, it "shall be used, unless the court determines that it does not accurately state the law." See *People v. Danielly*, 274 Ill.App.3d 358, 367 (1st Dist. 1995) ("Whenever applicable, an Illinois Pattern Jury Instruction (IPI) should be used whenever it

accurately states the law.") Therefore, although pattern jury instructions are not themselves law and are open to challenge if they are inaccurate statements of the law, the instructions are mandatory, if applicable and accurate. *People v. Polk*, 407 Ill.App.3d 80, 109 (1st Dist. 2010). A trial court may only deviate from the pattern jury instructions to accommodate unusual facts or intervening changes in the law. *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 63. If an appropriate IPI instruction does exist, it must be used, however, the decision to give or refuse a non-IPI instruction is a matter within the sound discretion of the trial court. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 33 (citing *People v. Hammonds*, 409 Ill.App.3d 838 (1st Dist. 2011)). "'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.'" *Bailey v. Mercy Hospital and Medical Center*, 2021 IL 126748, ¶ 42 (quoting *Studt v. Sherman Health Systems*, 2011 IL 108192, ¶ 13). Here, respondent exclusively argues that utilization of IPI 2.04 was error because it did not accurately state the law; he does not argue that he should have been able to use a non-pattern jury instruction because there were unusual facts or intervening changes in the law.

¶ 93    Here, the jury received IPI 2.04, as follows:

"….I'm allowing the witness to testify in court to materials including, but not limited to, police reports, Department of Corrections records, Department of Human Services' records, psychological evaluations, psychological testing, psychological articles and statements other than those made by the respondent to the witness."

"None of this material has been admitted into evidence. The testimony will be allowed for a limited purpose. It will be allowed so that the witness may tell what he or she relied on to form his or her opinion. The material being referred to is not evidence in this case and

may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give to the opinions testified to by this witness."

¶ 94    Respondent proposed that the trial court, instead, instruct the jury using the language from the State of Washington Pattern Jury Instruction 365.03. This instruction also included a provision instructing the jury that it "may not consider [basis of opinion testimony] as evidence that the information relied upon by the witness is true or that the events described actually occurred." *Id.*

¶ 95    At the outset, in addressing this issue, we recognize that "[t]he Illinois pattern jury instructions 'have been painstakingly drafted,' and the trial courts 'should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies.'" (Internal quotation marks omitted.) *People v. Smith*, 2017 IL App (1st) 143728, ¶ 97 (quoting *People v. Durr*, 215 Ill.2d 283, 301 (2005)).

¶ 96    In arguing that IPI 2.04 inaccurately states the law, respondent relies upon the decisions in *In re Commitment of Gavin*, 2014 IL App (1st) 122918, and *In re Commitment of Montanez*, 2020 IL App (1st) 182239. For instance, in *Gavin*, the defendant attacked the propriety of the State's closing arguments relating to the basis of opinion testimony by the expert witnesses. The State argued, in part, that the trial court's use of IPI 2.04 mitigated any resulting prejudice from the impropriety of the arguments. *Id.* ¶ 77. However, the *Gavin* court found that the way the State presented their argument rebutted the presumption that this instruction was followed. *Id.* ¶ 78. In doing so, the court found that "[t]he jury was properly instructed" when it was given this pattern jury instruction, but "acknowledge[d] that this instruction, in some circumstances, is confusing." *Id.* The court acknowledged the criticism outlined by David H. Kaye *et als*., The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.7.2 (2d ed. 2010), that:

"'the jury is told not to consider the otherwise inadmissible basis testimony for its truth. *** this limiting instruction is even more troubling than most. It asks of juries something that is not just practically difficult, but logically incoherent. *** [Because] expert basis testimony is only relevant – even for the limited purpose of evaluating the expert's testimony – if it turns out to be true. If the expert's basis is false, any conclusions reached on that basis are unsubstantiated and unhelpful. To admit basis testimony for the nonhearsay purpose of jury evaluation of the experts is therefore to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis. Having invited the jury to make such an assessment, is it either fair or practical then to ask the jury to turn around and ignore it?'"

¶ 97    We find that this passage in the treatise is actually critical of a jury instruction in which "the jury is told *not* to consider the otherwise inadmissible basis testimony for its truth…" [Emphasis added] *Id*. Thus, because this passage is directed towards criticizing the very same jury instruction that respondent seeks to include in this case, respondent's reliance upon this passage to support the inclusion of a nonpattern jury instruction is misplaced. It does not provide grounds for us to find that the pattern jury instruction provided to the jury in this case inaccurately states the law.

¶ 98    Moreover, while the court in *Gavin* noted that a jury may occasionally be confused in some cases - in particular, where this information is improperly argued at trial - it did not find that the utilization of IPI 2.04 in that case, was inaccurate or amounted to error. In fact, it found that the defendant was properly instructed.

¶ 99    Moreover, in *Montanez*, the court did not find that the utilization of IPI 2.04 in that case was inaccurate or amounted to error. *Montanez*, 2020 IL App (1st) 182239, ¶¶ 91-96. Instead, the court addressed the respondent's argument that the trial court, as the trier of fact, improperly accepted

as true the information of the respondent's criminal history on which the State's experts relied for their conclusions that respondent was a sexually violent person. *Id.* ¶ 91. In addressing the respondent's claim, the court found that, when evaluating the testimony of an expert witness, the factfinder faces a difficult task "…to evaluate (among other things) the underlying facts on which the expert relied. But the factfinder is not permitted to accept those facts as true." *Id.* ¶ 93 (citing *People v. Williams*, 238 Ill.2d 125, 143 (2010); *Gavin*, 2014 IL App (1st) 122918, ¶¶ 68, 73). In support of this finding about the difficulties of a factfinder in assessing expert witness testimony, the court relied on the same treatise passage regarding the introduction of expert evidence. *Id.* ¶ 95. Thus, the discussion of this type of evidence in *Montanez* was critical of the ability of a factfinder to properly analyze it. However, it does not provide any support for respondent's claim, here, that the pattern jury instruction constituted an inaccurate statement of the law.

¶ 100      Given that IPI 2.04 correctly states the law applicable to a consideration of basis of opinion of expert testimony, we conclude that the trial court did not abuse its discretion when it refused to give the jury respondent's proposed non-IPI instruction.

¶ 101                                  CONCLUSION

¶ 102 For these reasons, the judgment of the circuit court is affirmed.

¶ 103 Affirmed.